

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-2008

# USA v. Silveus

Precedential or Non-Precedential: Precedential

Docket No. 07-3544

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Silveus" (2008). *2008 Decisions.* Paper 448.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/448

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-3544
_____

UNITED STATES OF AMERICA

v.

ROZALINE SILVEUS,

Appellant

_____

On Appeal from the District Court
for the Virgin Islands
(No. 06-cr-00065-2)
District Judge: Honorable Curtis V. Gomez

_____

Argued May 8, 2008

Before: RENDELL, FUENTES, and
CHAGARES, Circuit Judges

(Opinion Filed: September 9, 2008)

Everard E. Potter, Esq.      (Argued)
Office of United States Attorney
United States Courthouse
5500 Veterans Building, Suite 260
Charlotte Amalie, St. Thomas
USVI, 00802-6924

Counsel for Appellee

David J. Cattie, Esq.        (Argued)
Ogletree, Deakins, Nash, Smoak & Stewart
1336 Beltjen Road, Suite 201
Charlotte Amalie, St. Thomas
USVI, 00802-0000

Counsel for Appellant

_____

OPINION OF THE COURT

_____

FUENTES, Circuit Judge:

Rozaline Silveus's cohabitant and boyfriend, Dorsainvil Jean, failed to report for deportation, prompting a search by immigration authorities. After agents failed to find Jean at their residence, an immigration agent received an anonymous tip that Silveus and Jean were transporting illegal aliens from St. John to St. Thomas on a ferry. The primary issues on appeal are the constitutional validity of the subsequent seizure and arrest of Silveus on the ferry, and the sufficiency of the evidence to support Silveus's convictions for harboring Jean at their apartment and transporting illegal aliens. Because immigration officials had reasonable suspicion that Silveus would be transporting an illegal alien and fugitive, her seizure and arrest were lawful. However, we conclude that the evidence produced at trial was insufficient to support Silveus's harboring conviction.

**I.**

While the appellant in this case is Rozaline Silveus, the factual history begins with the search for her boyfriend and codefendant, Dorsainvil Jean. Jean, a Haitian national, was denied asylum and ordered to depart the United States on February 8, 2006. However, Jean violated this order and remained in the Virgin Islands, prompting a search by agents from Immigration and Customs Enforcement ("ICE"). ICE was familiar with both Jean and Silveus, who were in business together filing asylum papers and serving as translators for recently arrived Haitian aliens.

-2-

Sometime in early April 2006, ICE followed a lead to Jean and Silveus's apartment in St. Thomas, where they had been living under a joint lease entered into before Jean was ordered to depart the United States. Agent Michael Harrison, one of two agents who visited Silveus's apartment, testified that "[a]s I approached the apartment, I heard the door of the apartment slam. Then I heard bushes break. And as I rounded the corner, I saw Ms. Silveus shutting the front door. . . . She opened the window and talked to me through the window." App. 157-58. Silveus allegedly stated that Jean was not in the apartment and that she "didn't know" if anyone had run out of the apartment prior to the agents' arrival. App. 158. She refused the officers' request to look in the apartment for his personal belongings. Agent Harrison and another agent returned to the apartment the following month, but were told by the landlord's daughter that Silveus and Jean were not present.

Four months later, on September 15, 2006, Agent Harrison received a phone call at his office from an anonymous informant, who stated that Jean and Silveus were in St. John to pick up illegal aliens and transport them in Silveus's SUV to St. Thomas via car ferry, a journey of about four miles. The informant identified Jean and Silveus by name, and identified the license plate number and color of Silveus's SUV. According to Agent Harrison's testimony at a suppression hearing, he received a similar tip from a person with an identical voice two weeks earlier, leading him to believe that this was the same informant. Agent Harrison testified that he "gave all the information to the Deportation Section, and because [Jean] was illegally in the country, [two agents, Roy Rogers and Jason Allen,] were dispatched" to the St. Thomas landing point to intercept the ferry from St. John. App. 59.

When the ferry arrived, Agents Rogers and Allen prevented all passengers from disembarking, then boarded the boat and located the SUV that had been identified by the informant. The agents observed Silveus in the driver's seat, a pair of pants on the passenger seat, and two individuals, later identified as Marctenson Marc and Marie Dana Supreme, in the back seat. Marc and Supreme could not speak English and could not communicate with the agents. According to Agent Harrison's suppression hearing testimony, although Marc and Supreme were inside Silveus's SUV,

-3-

their clothing was wet, suggesting that they had been in the water before boarding the ferry. This testimony was unopposed by defense counsel at the suppression hearing, but, at trial, both Marc and Supreme testified that they were wearing dry clothing. One of the arresting officers, Agent Rogers, could not recall at trial whether Marc and Supreme were wearing wet clothing, but he stated that they appeared "nervous," "scared," and "disoriented." App. 326-27.

Agent Rogers also testified at trial that he asked Silveus where Jean was and she responded that he remained behind in St. John. The agents did not believe Silveus and wanted to obtain a translator to question Marc and Supreme, so they detained all three passengers in the agents' van and removed the SUV from the ferry. Shortly thereafter, the agents spotted Jean treading water near the ferry. After arresting him, they brought all four detainees and Silveus's SUV to the immigration office, where Marc and Supreme promptly admitted through a translator that they were illegal aliens from Haiti.

Two days after Silveus's arrest, Agent Harrison conducted an inventory search of the SUV and found Haitian identification documents under the front passenger floor mat for Marc and at least one other Haitian, Gordany Vancol. Sometime thereafter, Vancol applied for asylum and informed agents that he too was in Silveus's SUV, but was concealed in the rear of the vehicle. He stated at trial that he escaped undetected while the agents were apprehending Jean.

A federal grand jury returned a joint indictment against Jean and Silveus, charging Silveus with three counts of aiding and abetting the transportation of three illegal aliens—Supreme, Marc, and Vancol—in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). In addition, Silveus was charged with one count of harboring and shielding Jean at their apartment in St. Thomas in violation of 8 U.S.C. § 1324(a)(1)(A)(iii).[1]

---

[1]Jean was charged with three counts of transporting illegal aliens and one count of failing to report for deportation.

On the morning of trial, Silveus moved to suppress the evidence seized from her car, arguing that the initial seizure of the ferry and her subsequent arrest violated her Fourth Amendment rights. This motion was denied, and the case proceeded to trial.

Following the close of the government's case-in-chief, Silveus moved for an acquittal under Federal Rule of Criminal Procedure 29, alleging that the government produced insufficient evidence to support a conviction. The District Court denied this motion. After both parties rested, the jury returned a guilty verdict on all counts. Silveus then filed post-trial motions requesting reconsideration of the motion to suppress, the motion for acquittal under Rule 29, and seeking a new trial under Rule 33 because "the interest of justice so requires." Fed. R. Crim. P. 33. The District Court denied these motions, and sentenced Silveus to 16 months' imprisonment.

Silveus appeals. She challenges the District Court's denial of her motion to suppress, motion to acquit, and motion for a new trial. She also argues that she was denied the right to present a defense because the District Court improperly curtailed her cross-examination of Agent Harrison regarding a previous prosecution of her co-defendant, Jean.[2]

## II.

Silveus challenges the District Court's denial of her motion to suppress the evidence seized from her vehicle. She argues that the identification documents found under the front floor mat, and the testimony of Marc and Supreme, were all obtained as a result of an unlawful seizure. In denying the motion to suppress, the District Court stated that

given the totality of the circumstances, the Court

---

[2]The District Court exercised original jurisdiction over this case pursuant to 48 U.S.C. § 1612(a) and 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1294(3) and 28 U.S.C. § 1291.

[concludes] that the tip received . . . by Agent Harrison about someone being Mr. Dorsainvil Jean in this case, and the possibility of transportation of illegal immigrants, certainly if no place else, at the border, [permitted] the agents [to] make an inquiry, which is what they did.

And the Court finds that the inferences made from what they observed were reasonable inferences, and the arrest was proper. And so the search incident to that arrest was proper.

App. 78-79.[3] We "review[] the district court's denial of the motion to suppress for 'clear error as to the underlying facts, but exercise plenary review as to its legality in light of the court's properly found facts.'" United States v. Riddick, 156 F.3d 505, 509 (3d Cir. 1998) (quoting United States v. Inigo, 925 F.2d 641, 656 (3d Cir. 1991)) (alterations omitted).

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend IV. Our analysis necessarily begins by identifying the moment when Silveus was first "seized." We then must determine whether that seizure was reasonable, i.e., whether there was reasonable suspicion of criminal activity. See United States v. Mosley, 454 F.3d 249, 257 (3d Cir. 2006). A seizure occurs "when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968); see also United States v. Williams, 413 F.3d 347, 352 (3d Cir. 2005). In this case, a seizure occurred when the agents, through a show of authority, prevented Silveus from disembarking

---

[3]In the alternative, the District Court held that the search was a proper border search. See United States v. Ramsey, 431 U.S. 606, 619 (1977). At oral argument the government distanced itself from this holding, presumably because the ferry was traveling between two United States ports. Because we conclude that the search and seizure was constitutional on other grounds, we need not address the District Court's alternative holding.

the ferry.  Cf., Mosley, 454 F.3d at 253 ("[I]t is settled law that a traffic stop is a seizure of everyone in the stopped vehicle.").

Generally, warrantless searches and seizures are *per se* unreasonable under the Fourth Amendment.  See Williams, 413 F.3d at 351.  However, there are several exceptions to this rule. The parties agree that the proper focus in this case is whether the exception for short investigatory stops, or Terry stops, is applicable to Silveus's initial seizure.

The Fourth Amendment permits law enforcement to stop vehicles briefly for further investigation when there is reasonable suspicion that criminal activity may be afoot.  See Alabama v. White, 496 U.S. 325, 328-30 (1990).  Reasonable suspicion requires "'some minimal level of objective justification' for making the stop."  White, 496 U.S. at 329-30 (quoting INS v. Delgado, 466 U.S. 210, 217 (1984)).  This is a lower hurdle than the probable cause necessary to obtain a search warrant, given the lesser infringement on an individual's liberty.  "[P]robable cause means 'a fair probability that contraband or evidence of a crime will be found,' and the level of suspicion required for a Terry stop is obviously less demanding than for probable cause."  Id. at 330 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  While the standards are different, both reasonable suspicion and probable cause require the Court to consider the totality of the circumstances.  Id.  When one circumstance leading to a Terry stop is an anonymous tip of criminal activity, we consider its degree of reliability.  As the Supreme Court stated in White, "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable."  Id.  By "information," White implies corroborative information known to or discovered by the police, which can, when coupled with the tip, create reasonable suspicion to make a stop.  See id. at 329-30.

In this case, the ICE agents had reasonable suspicion that Jean, a fugitive, would be on the ferry, and that Silveus would be transporting him.  The ICE agents were familiar with both Silveus and Jean because they filed asylum papers and translated for asylum applicants who often appeared at ICE's offices in St.

Thomas. The agents were aware that Silveus and Jean lived together and were involved in a romantic relationship. Finally, they knew that Jean's asylum application had been denied and he had failed to report for deportation. The anonymous informant identified Jean and Silveus by name, placed them together, and identified Silveus's car by color and license plate number. The tip appeared to be reliable, given that it was corroborated by the agents' prior knowledge. At that point they had reasonable suspicion that two crimes were being committed on the ferry: Jean's failure to report for deportation, and Silveus's transportation of Jean, an illegal alien and fugitive.

Silveus cites to Florida v. J.L., 529 U.S. 266 (2000), as support for her argument that the initial stop was made without the requisite reasonable suspicion. In J.L., the police received an anonymous tip that an unnamed black male in a plaid shirt was standing at a bus stop with a gun. Id. at 268. Based solely on this anonymous tip, two police officers approached three black males standing near the bus stop, one of whom was wearing a plaid shirt. Id. The officers frisked each of them, and found a gun in the pocket of the male in the plaid shirt. Id. The Supreme Court noted that the police officers only corroborated the defendant's "readily observable location and appearance," while "[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." Id. at 272. Because the Terry stop in that case was made without reasonable suspicion of criminal activity, the Supreme Court held that it violated the Fourth Amendment, warranting suppression of the firearm.

Unlike the tip in J.L., the anonymous tipster in the present case provided information already known to the agents about ongoing criminal activity: Jean's continued failure to report for deportation. The informant also stated that Jean and Silveus were together in Silveus's vehicle. Given the agents' prior knowledge of the close relationship between Silveus and Jean, these details permitted a reasonable belief that the tip was in fact accurate. In short, when the tipster identified Jean, Silveus, and Silveus's vehicle, given the agents' prior knowledge, we believe they had a "reasonable, articulable suspicion that criminal activity [was]

afoot," <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000) (citing <u>Terry</u>, 392 U.S. at 30), and they were justified in stopping Silveus from disembarking the ferry so that they could investigate further.

We have stated that following a valid investigatory stop, "an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." <u>United States v. Givan</u>, 320 F.3d 452, 458 (3d Cir. 2003); <u>see also</u> <u>Mosley</u>, 454 F.3d at 255 n.9 ("A traffic stop requires only reasonable suspicion to believe that a traffic violation has been committed. But detaining the vehicle longer than is necessary to effectuate the legitimate response to that traffic violation requires independent suspicion that some other crime is afoot."). That is precisely what happened in this case. Once Agent Rogers located Silveus's vehicle on the ferry, he observed that there were pants on the empty front passenger seat and two visibly nervous passengers in the rear who could not speak English. These observations lent credence to the original tip that Silveus would be transporting illegal aliens in her SUV on the ferry. While the initial <u>Terry</u> stop was justified by a reasonable suspicion of Jean's continued failure to report for deportation and Silveus's transporting of Jean, the officers developed an independent suspicion, once on the ferry, that Silveus was transporting other illegal aliens.

Silveus's primary argument in challenging the validity of her subsequent arrest is that the District Court placed undue reliance on the wetness of the aliens' clothes, a finding suggested at the suppression hearing, but later undermined at trial. In reviewing the denial of a motion to suppress evidence, "this court may look at the entire record; it is not restricted to the evidence presented at the suppression hearing where the motion was denied." <u>Gov't of Virgin Islands v. Williams</u>, 739 F.2d 936, 939 (3d Cir. 1984). Even absent the suppression hearing testimony regarding Marc and Supreme's wet clothing, there was still trial testimony by Agent Rogers that Marc and Supreme appeared "nervous," "scared," and "disoriented." App. 326-27. We conclude, in consideration of the totality of the circumstances, that "the objective facts available to the officers at the time of arrest

were sufficient to justify a reasonable belief that an offense was being committed," thereby justifying Silveus's arrest. United States v. Glasser, 750 F.2d 1197, 1206 (3d Cir. 1984).

Finally, two days following Silveus's arrest, Agent Harrison found identification documents for several Haitian aliens during a routine inventory search of Silveus's impounded vehicle. Inventory searches are excepted from the general warrant requirement for several reasons: to protect the owner's property while it remains in police custody, to protect the police from claims or disputes over lost property, and to protect the police from potential danger. See South Dakota v. Opperman, 428 U.S. 364, 369 (1976). Silveus does not argue that the police "acted unreasonably in impounding and removing the vehicle" following a lawful arrest, United States v. Smith, 522 F.3d 305, 315 (3d Cir. 2008), and does not contest that the police can undertake an inventory search following a lawful arrest and impoundment. Rather, she only argues that the initial arrest was unlawful. Because we reach the opposite conclusion, we will affirm the District Court's denial of the motion to suppress the evidence found in Silveus's vehicle.

**III.**

Silveus's next contention is that the jury's verdict rested on insufficient evidence, warranting an acquittal under Federal Rule of Criminal Procedure 29. We exercise plenary review over a district court's grant or denial of a motion for acquittal based on the sufficiency of the evidence, applying the same standard as the district court. United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005). Hence, we apply "a particularly deferential standard of review," United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998) (citations omitted), viewing "the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." United States v. Smith, 294 F.3d 473, 476 (3d Cir. 2002) (quoting United States v. Wolfe, 245 F.3d 257, 262 (3d Cir. 2001)).

**A.**

Silveus was indicted and convicted for three counts of violating 8 U.S.C. § 1324(a)(1)(A)(ii) by aiding and abetting the transportation of Marc, Supreme, and Vancol from St. John to St. Thomas. Section 1324(a)(1)(A)(ii) penalizes a person who

> knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law.

8 U.S.C. § 1324(a)(1)(A)(ii). To sustain a conviction under this section, the government must prove that (1) the defendant transported or attempted to transport an alien within the United States, (2) the alien was in the United States illegally, (3) the defendant knew of or recklessly disregarded the fact that the alien was in the United States illegally, and (4) the defendant acted willfully in furtherance of the alien's violation of the law. See United States v. Williams, 132 F.3d 1055, 1059 (5th Cir. 1998); United States v. Parmelee, 42 F.3d 387, 391 & n. 5 (7th Cir. 1994); see also United States v. Barajas-Chavez, 162 F.3d 1285, 1288 (10th Cir. 1999).

Silveus challenges the sufficiency of the evidence with respect to the fourth element: whether she acted willfully in furtherance of Marc, Supreme, and Vancol's violation of the law. She argues that the evidence only proved that she was giving a ride to the Haitians; it did not support a finding that she intended "to deliberately assist an alien in maintaining his or her illegal presence in this country." Appellant's Br. 24 (quoting United States v. Stonefish, 402 F.3d 691, 695 (6th Cir. 2005) (citation and quotation marks omitted)).

The government produced several witnesses to testify about the transporting charges. Rock Feller Sorel was a Haitian national who traveled from St. Maarten to St. John on the same night as

-11-

Marc, Supreme, and Vancol. He testified that soon after he arrived in St. John at 2:00 A.M., Silveus and Jean approached him and the other illegal aliens and collected identification documents and money for transportation to St. Thomas. Next, both Marc and Vancol testified that either Silveus or Jean collected their identification documents before they got into Silveus's SUV, which she drove onto the ferry. Vancol additionally testified that Silveus and Jean hid him in the rear of the vehicle prior to boarding the ferry. Moreover, the government produced Haitian identification documents that had been concealed underneath the front passenger side floor mat of Silveus's vehicle. Finally, the jury was informed that Silveus was in the business of filing asylum papers and translating for Haitian aliens, which supported the government's theory that Silveus and Jean transported the illegal aliens not as a friendly gesture, but rather to develop their client base.

Given the evidence presented at trial, a rational juror could have concluded that Silveus acted with the intent to further Marc, Supreme, and Vancol's illegal presence in the United States. We will therefore affirm the District Court's denial of Silveus's motion to dismiss the transporting conviction for insufficiency of the evidence.

**B.**

Silveus was also charged with, and convicted on, one count of harboring Jean "within an apartment at 5-24 Estate Sorgenfri" from "February 8, 2006 up to and including September 15, 2006," in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). App. 22. The relevant section is violated if a person,

> knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation.

8 U.S.C. 1324(a)(1)(A)(iii). To sustain a conviction under this

-12-

section, the government must prove "conduct tending substantially to facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting [the alien's] unlawful presence." United States v. Ozcelik, 527 F.3d 88, 99 (3d Cir. 2008) (quotation marks and alteration omitted).

Silveus knew that Jean was an illegal alien in the United States. Therefore, the only issue on appeal is whether Silveus "harbored" him at her apartment, as charged in the indictment. The government does not dispute that cohabitation with Jean, taken alone, does not constitute "harboring" within the meaning of the statute. Rather, the government asserts that there was sufficient evidence for a reasonable juror to conclude that Silveus violated the harboring provision of § 1324 in early April when Agent Harrison visited the apartment looking for Jean. The government's only evidence offered at trial to support the harboring conviction is Agent Harrison's testimony:

> Q.   And when you went [to the apartment] searching for [Jean], what, if anything, happened?
>
> ***
>
> A.   As I approached the apartment, I heard the door of the apartment slam. Then I heard bushes break. And as I rounded the corner, I saw Ms. Silveus shutting the front door.
>
> Q.   And when you saw Ms. Silveus shutting the front door, what, if anything, did you do?
>
> A.   She opened the window and talked to me through the window. . . . I asked her if Dorsainvil Jean was in the apartment. And she told me, no. And I asked her if any of his personal belongings were in the apartment. Could I come in and look. And she told me, no.

-13-

Q.      Did you ask her any questions regarding your observations of the bushes?

A.      Yes, sir.  I asked if anybody had run out of the apartment.  And she said she didn't know.

App. 157-58.  Agent Harrison later stated that Silveus "more or less shut the door in my face."  App. 227.  Based on this account, the District Court denied Silveus's Rule 29 motion, stating that "there was testimony that Ms. Silveus, I believe, slammed the door or closed the door in the face of Agent Harrison.  The jury could infer from that . . . she has reasonable control over the premises."  App. 418.

Reasonable control of the premises, however, is not an element of "harboring" under § 1324.  Rather, the government had to prove that Silveus's "conduct tend[ed] substantially to facilitate [Jean's] remaining in the United States illegally and to prevent government authorities from detecting his unlawful presence."  Ozcelik, 527 F.3d at 99 (quotation marks and alteration omitted).

After giving the government the benefit of every reasonable inference, we find Agent Harrison's testimony insufficient for a reasonable juror to find, beyond a reasonable doubt, that Silveus's conduct constituted "harboring" within the meaning of § 1324.  Agent Harrison conceded at trial that he never saw Jean on the day he went to the apartment.  Hence, to conclude that Silveus was "harboring" Jean, a juror would have to conclude that Jean ran out of the apartment based on Agent Harrison's account of the noises in the bushes, the fact that Silveus was shutting the door as Agent Harrison rounded the corner, and Agent Harrison's testimony that Silveus said she "didn't know" whether anybody had run out of the apartment.  App. 157-58.[4]  A jury may use circumstantial evidence

_____

[4]At oral argument, the government suggested that there was sufficient evidence for the jury to conclude that Jean was running into the apartment, rather than out of the apartment.  To accept that conclusion, however, the jury would have to disagree with the government's only witness, who presumed that Jean was running

-14-

to support reasonable inferences of fact. See United States v. McNeill, 887 F.2d 448, 450 (3d Cir. 1989) ("Inferences from established facts are accepted methods of proof when no direct evidence is available so long as there exists a logical and convincing connection between the facts established and the conclusion inferred."). But in this case the evidence supports no more than mere speculation as to Jean's presence.

We conclude that no reasonable juror could have found Silveus guilty of harboring Jean at their joint apartment based on the evidence presented at trial. Because the harboring conviction is based on legally insufficient evidence, we will reverse the denial of the Rule 29 motion as to that charge, and vacate Silveus's conviction for harboring Jean in violation of § 1324.

## V.

Silveus next contends that the District Court erred in denying her motion for a new trial on her conviction for aiding and abetting the transportation of illegal aliens, arguing that Vancol's testimony was perjured.[5] Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002). However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial "only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." Id. (citation and quotation marks omitted). We review the denial of a motion for a new trial pursuant to Rule 33 for abuse

out of the apartment.

[5]Silveus also moved for a new trial on her harboring conviction. Because we are dismissing that conviction for insufficient evidence, we need not consider it in this section.

-15-

of discretion. <u>United States v. Jasin</u>, 280 F.3d 355, 360 (3d Cir. 2002). Such motions are not favored and should be "granted sparingly and only in exceptional cases." <u>Gov't of Virgin Islands v. Derricks</u>, 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted).

Silveus argues that Vancol's story that he was in the car but unnoticed by the agents was "so incredible as to deny any indication that the jury actually considered the facts when entering its verdict." Appellant's Br. 30. We disagree. Given Vancol's testimony that he was concealed in the back of Silveus's SUV, and the fact that Vancol's identification documents were found under the front passenger floor mat, the District Court did not abuse its discretion in rejecting Silveus's argument that the jury verdict was against the weight of the evidence. We will therefore affirm the District Court's denial of Silveus's motion for a new trial pursuant to Rule 33.

## VI.

Silveus's final argument is that the District Court violated her Sixth Amendment right of confrontation when it limited her cross-examination of Agent Harrison regarding potential bias, and therefore abused its discretion by not granting her motion for a severance. In particular, Silveus wanted to question Agent Harrison about a prior prosecution of Jean, which resulted in an acquittal. Agent Harrison, she argues, felt personally insulted by the acquittal. When Jean failed to depart the United States, Agent Harrison obsessively pursued him, frequently requesting that Silveus turn him over to the immigration authorities. In addition, Silveus contends that Agent Harrison made romantic passes at Silveus. According to Silveus, "[w]hen [she] would not submit to [Agent] Harrison's advances and requests, she too became a subject of Harrison's obsession, resulting, ultimately, in her arrest, conviction, and possible deportation." Appellant's Br. 61.

During trial, counsel for Jean objected to Silveus's questions concerning Jean's prior prosecution. The District Court sustained these objections, finding that testimony regarding Jean's prior prosecution would be more prejudicial than probative. <u>See</u> Fed R. Evid. 403 ("Although relevant, evidence may be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice . . . .").  The District Court explained the scope of its limitation: "If you want to explore bias, you can do that.  If you want to question this witness's credibility, you can do that.  But what you cannot do, I'll just make it clear, is go into a prior prosecution."  App. 199.  We review both a district court's denial of a motion for a severance and limitation on cross-examination for abuse of discretion.  United States v. Balter, 91 F.3d 427, 433 (3d Cir. 1996); United States v. Ellis, 156 F.3d 493, 498 (3d Cir. 1998).

"There is a preference in the federal system for joint trials of defendants who are indicted together," because "[t]hey promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" Zafiro v. United States, 506 U.S. 534, 537 (1993) (quoting Richardson v. Marsh, 481 U.S. 200, 210 (1987)).  Nevertheless, Federal Rule of Criminal Procedure 14(a) states that "[i]f the joinder of . . . defendants . . . for trial appears to prejudice a defendant . . . , the court may . . . sever the defendants' trials, or provide any other relief that justice requires." Id.  The Supreme Court has declined to adopt a bright-line rule for severance anytime defendants have conflicting defenses.  Zafiro, 506 U.S. at 538.  Instead, the Supreme Court has instructed that trial courts should grant a severance under Rule 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  Zafiro, 506 U.S. at 539.

The question presented, then, is whether the District Court's limitation on cross-examination compromised Silveus's right to confrontation.  The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Supreme Court has held that "[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination."  Davis v. Alaska, 415 U.S. 308, 315-316 (1974) (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)). Moreover, "exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."  Id. at 316-317 (citing Greene v.

-17-

McElroy, 360 U.S. 474, 496 (1959)). Nevertheless, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).

In United States v. Chandler, 326 F.3d 210 (3d Cir. 2003), we established a two-part test to determine whether a judge's limitation on cross-examination violates the Confrontation Clause:

> First, we must determine whether that ruling significantly inhibited [a defendant's] effective exercise of her right to inquire into [the] witness's 'motivation in testifying'; and second, if the District Court's ruling did significantly inhibit [the defendant's] exercise of that right, whether the constraints it imposed on the scope of [the] cross-examination fell within those 'reasonable limits' which a trial court, in due exercise of its discretion, has authority to establish.

Id. at 219.

We conclude that the District Court's limitations did not inhibit Silveus's effective exercise of her right to inquire into bias, and therefore the District Court did not abuse its discretion by limiting Silveus's cross-examination of Agent Harrison. Silveus claims that she became "a subject of Harrison's obsession" only after she refused to "submit to Harrison's advances and requests." Appellant's Br. 61. Up until that time, Silveus contends that Agent Harrison sought a romantic relationship and her assistance in apprehending Jean for his failure to depart. Silveus inquired about Agent Harrison's requests that Silveus break up with Jean, turn him over to the authorities, and date Agent Harrison instead:

> Q.  [O]n several occasions you asked Ms. Silveus to – you told her that she should cease her relationship with Mr. Jean; is that correct?

-18-

A.     I don't believe I used those words.

Q.     What words did you in fact use, sir?

A.     I asked her to have Mr. Jean turn himself in.

Q.     And was that the limit of your conversations with Ms. Silveus?

A.     Yes, sir.  It was just in passing.

Q.     Did you ever have occasion to ask Ms. Silveus out on a date?

A.     Never.

App. 205.  Silveus was only precluded from questioning Agent Harrison about Jean's prior prosecution, and this reasonable limitation did not "significantly inhibit" her "effective exercise of her right to inquire into [the] witness's 'motivation in testifying.'" Chandler, 326 F.3d at 219.  Therefore, we conclude that the District Court did not abuse its discretion by limiting Silveus's cross-examination of Agent Harrison.

## VII.

For the foregoing reasons, we will affirm the District Court's denial of Silveus's suppression motion, motion to dismiss the transporting convictions for insufficiency of the evidence, and motion for a new trial under Rule 33.  We also conclude that the District Court did not abuse its discretion by limiting Silveus's cross-examination of Agent Harrison.  However, we will reverse Silveus's conviction for harboring Jean at their apartment, because the government produced insufficient evidence at trial to support a conviction.