NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1009
_____

UNITED STATES OF AMERICA

v.

KEITH WATERS,
                    Appellant
_____

APPEAL FROM THE JUDGMENT OF SENTENCE IN THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(Case No. 2-08-cr-00636-001)
District Judge: Honorable Stewart Dalzell
_____

Submitted Under Third Circuit LAR 34.1(a)
February 9, 2011
_____

Before: JORDAN, GREENAWAY, JR., and WEIS, Circuit Judges

(Opinion Filed: May 19, 2011)

_____

OPINION
_____

GREENAWAY, JR., Circuit Judge

    Keith Waters ("Waters") appeals from the judgment of the United States District

Court for the Eastern District of Pennsylvania convicting him of carrying and using a

1

firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), and of interfering with interstate commerce by robbery, in violation of the Hobbs Act ("Hobbs Act" or "the Act"), 18 U.S.C. § 1951(a). Waters also appeals from the District Court's commitment order sentencing him to 420 months of imprisonment. He asserts that the search of his apartment lacked probable cause and that the District Court, therefore, erred by denying his motion to suppress the physical evidence obtained during that search. Waters also asserts that police officers presented him to Joel Goodman ("Goodman") and Aaron Watkins ("Watkins") for identification purposes in a manner that was unnecessarily suggestive and that the District Court, therefore, violated Waters's Fifth Amendment right to due process by denying his motion to suppress Goodman's and Watkins's identification testimony. Finally, Waters contends that the Government's evidence was insufficient to establish that the charged robbery interfered with interstate commerce and that the District Court abused its discretion by refusing to admit specific out-of-court statements Goodman had made. We disagree with Waters's assertions. For the following reasons, we will affirm the District Court's judgment.

## I. BACKGROUND

We write primarily for the benefit of the parties and recount only the essential facts.

On the morning of January 17, 2008, Joel Goodman arrived at his business, "Cheltenham Avenue Check Cashing" (the "business"), in Melrose Park, Pennsylvania at 9:55 a.m. Goodman was carrying a black bag containing $108,700. As Goodman began

2

to put his key into the front door of his business, a man approached him and pointed a gun at his face. At trial, Goodman testified that the man had an oblong face and a scruffy beard and that he was black, about six feet to six feet and one inch tall, and wore a dark, hooded sweatshirt with the hood up over his head. Despite the sweatshirt, Goodman "could see [the man's] whole face clear as day." (Appellant's App., Vol. 2, at 96a.) The man told Goodman to give him the bag. Goodman refused, stumbled backwards, and fell. As Goodman fell, the man shot him in his right elbow and right leg. Then the man grabbed Goodman's bag, ran across the sidewalk, and entered the passenger seat of a waiting car. The car sped off.

According to Goodman, the entire incident lasted between four and seven seconds. Goodman testified that he directed his security guard to pursue the robber. Next, Goodman called his wife and told her what had occurred and that she should not worry. Goodman stated that he was in pain, but he "was totally aware of his situation," (Appellee's Supp. App. at 21), and he "was as calm as could be." (Id. at 41.) Goodman testified that, after ten to twenty seconds of pain, he was calm and "wasn't crying, wasn't freaking out, screaming." (Id.)

Aaron Watkins, a security guard employed by Goodman, testified that he arrived at the check cashing business between five and seven minutes before Goodman arrived and that he had witnessed the entire incident. Watkins's account of the events is similar to Goodman's. Watkins saw Goodman arrive soon after he (Watkins) parked his vehicle in front of the business. As Goodman opened the business's front gate, an older green

3

Honda Accord drove up and parked directly behind Watkins's vehicle. After Watkins exited his vehicle,[1] a man rushed out of the Honda and approached Goodman, pointing a 9mm or .45 caliber gun at Goodman's face.

Watkins further testified that the man was black, about six feet and one inch tall or six feet and two inches tall, and wore a black, hooded sweatshirt. The man shouted an expletive at Goodman and demanded money. Goodman denied having any money and the man shot him. The shooter then grabbed the bag and entered the passenger side door of the Honda before the car sped away. Watkins pursued the Honda in his own vehicle, but eventually lost sight of it.

At the crime scene, police officers found an empty shell casing on the ground. The police broadcasted a warning regarding two perpetrators fleeing the scene in a light green Honda Accord.[2] Police Officer Mark Johnson, who was patrolling the area in an unmarked vehicle with Officers Rivera and Colville, received the broadcast. Moments later, Johnson observed a light green Honda Accord traveling on Old York Road. A car chase ensued. Johnson observed that the driver of the Honda was a black female. The officers lost sight of the Honda. Then, on Old York Road, Officer Johnson observed Waters jump out of the passenger's side of the Honda Accord and into a red Eagle Vision. The black female who had driven the Honda Accord was now operating the

---

[1] Goodman testified that Watkins was standing approximately fifteen feet away from him on the street. (Appellant's App., Vol. 2, at 94a.) Watkins testified that he was standing right next to Goodman when the shooter approached. (Appellant's App., Vol. 2, at 160a.)
[2] According to Officer John McCabe, one on the first officers at the crime scene, the warning described the perpetrators as two black males in their twenties.

4

Eagle Vision. The Eagle Vision sped off, with the officers in pursuit. The Eagle Vision then stopped by an alley where Waters jumped out of the passenger seat of the Eagle Vision and ran. Officers Johnson and Rivera pursued Waters on foot and apprehended him.

Officers brought Watkins, Goodman's security guard, to Old York Road where Watkins saw the green Honda Accord and identified it as the getaway car. Several officers then brought Waters out of a police vehicle. Watkins told the police, "[t]hat's the man that shot [Goodman]." (Appellee's Supp. App. at 58.) Watkins had "no doubt in [his] mind" when he identified Waters as the shooter. (Id.) When Watkins identified him, Waters was handcuffed and surrounded by ten to twelve police officers. The identification occurred between seven and ten minutes after Goodman was shot.

Meanwhile, Goodman was brought to a hospital emergency room. According to Lieutenant DiGiuseppe, Goodman's condition appeared critical. Lieutenant DiGiuseppe informed Goodman that police officers would bring a "person of interest" in for identification purposes. (Id. at 384.) As medical personnel treated Goodman's injuries, two police officers brought Waters into the emergency room.[3] Goodman saw Waters and announced, "[t]hat's him. I'm 98 percent sure that's him." (Id. at 21.) At trial, Goodman could not remember whether the officers had been in uniform. He stated that he did not see that Waters was handcuffed. Goodman testified that he feared for his life

---

[3] Goodman testified that the officers stood at the entrance to the treatment area, about 10 feet away from where he was lying on a gurney. DiGiuseppe testified that after the officers brought Waters to the entrance they brought him "closer" to Goodman. (Appellee's Supp. App. at 385.)

because of his injuries, but that he "was totally aware of [his] situation," felt that he was "above pain," and that he was "calm as could be." (Id. at 21, 40, 41.) This identification occurred at approximately 10:52 a.m., less than one hour after the shooting.

Police Lieutenant John Hearn located the red Eagle Vision parked in front of 1537 Kinsdale Street in Philadelphia. Police traced the vehicle to Shermika Wells ("Wells"). Goodman's black bag containing $108,700 was found in a trash can at 1521 Kinsdale Street. At the time, police had not yet apprehended the female driver of the getaway cars or found the gun used to shoot Goodman.

Detective Steven Nicholas Motta interviewed Waters and obtained his address in Philadelphia. According to neighbors who lived in the building, Wells and Waters lived in the first floor apartment together. Motta obtained a search warrant for the apartment on January 17, the day of the incident. The search yielded a box of 9mm ammunition with stamping similar to that of the spent casing found at the crime scene. Officers also found a Glock magazine and a Pennsylvania permit to carry a concealed weapon in Wells's name.

On January 18, a 9mm Glock firearm wrapped inside of a glove was found in a parking lot at 6410 North Broad Street in Philadelphia. Detective Finor, a qualified expert in ballistics and firearms, testified that the shell casing found at the crime scene had been fired from the 9mm Glock found in the parking lot.

6

On April 30, 2009, Waters was indicted for a Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), and a related firearm charge, in violation of 18 U.S.C. § 924(c).[4]

Waters filed a pre-trial motion to suppress the evidence seized at the apartment on the grounds that the police lacked probable cause for the search warrant. On May 7, 2009, the District Court denied the motion. The District Court found that there had been "ample probable cause" to search the apartment because of the "rapidly-emerging exigent circumstance[s]" and because officers had been searching for the gun used in the shooting. (Appellant's App., Vol. 2, at 82a.)

Waters filed a motion to suppress the two out-of-court identifications, arguing that they were unnecessarily suggestive. On May 7, 2009 and May 21, 2009, the District Court denied the motions because the Court found Goodman to be a very credible witness, with experience in identifying faces. The District Court found that the totality of the circumstances rendered the identification procedure reasonable because Goodman's condition had appeared critical. The District Court also found that Watkins had made an "unqualified identification" with "conviction" and a "sufficient indicia of reliability," which rendered his testimony admissible. (Id. at 35a.)

On June 2, 2009, a jury trial commenced in the District Court. Waters sought to question Officer McCabe regarding a statement Goodman allegedly made at the scene of the crime to Officer McCabe, saying that he had been robbed by two black males in their twenties. The District Court ruled that this statement was inadmissible hearsay. The

---

[4] This indictment superseded two prior indictments for Hobbs Act robberies and related firearms charges.

statement did not qualify as an excited utterance because Goodman had testified about how calm he was at the time he made the statement.

At the close of the government's case, Waters filed a motion for judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, arguing that there was insufficient evidence to support a Hobbs Act violation. Specifically, Waters contended that there was not proof of a sufficient effect on interstate commerce. The District Court denied Waters's motion because it noted that Goodman was in the process of opening his business during the robbery and that the money stolen from Goodman was a business asset for use in interstate commerce.

On June 4, 2009, the jury found Waters guilty of both charges. On December 15, 2009, the District Court imposed a sentence of 420 months of imprisonment, a term of supervised release of five years, restitution in the amount of $18,000, a fine of $5,000, and a special assessment of $200. On December 19, 2009, Waters filed a timely notice of appeal.

## II. JURISDICTION and STANDARD OF REVIEW

The District Court had jurisdiction over this matter, pursuant to 18 U.S.C. § 3231. We have jurisdiction over this appeal under 28 U.S.C. § 1291.

This Court can only review an alleged error that was "not brought to the court's attention" at trial if "appellant demonstrates that (1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; [and] (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the

8

outcome of the district court proceedings.'"" United States v. Riley, 621 F.3d 312, 322 (3d Cir. 2010) (quoting United States v. Marcus, --- U.S. ----, 130 S. Ct. 2159, 2164 (2010)) (alteration in original). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Johnson v. United States, 520 U.S. 461, 467 (1997) (quotation marks and citation omitted); see Riley, 621 F.3d at 322. This Court reviews such contentions for plain error under Federal Rule of Criminal Procedure 52(b). Marcus, 130 S. Ct. at 2164; Riley, 621 F.3d at 321–22.

A district court's evidentiary rulings are reviewed for abuse of discretion. United States v. Kemp, 500 F.3d 257, 295 (3d Cir. 2007). The District Court's interpretation of the Federal Rules of Evidence is, however, subject to plenary review. United States v. Brown, 254 F.3d 454, 458 (3d Cir. 2001).

This Court reviews the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercises plenary review of the District Court's application of the law to those facts. United States v. Riddick, 156 F.3d 505, 509 (3d Cir. 1998). Because the District Court "'did not question the facts contained in the affidavit' supporting the search warrant," this Court "sits like a district court and must, like the district court, give great deference to the magistrate judge's probable cause determination." United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) (quoting United States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993)) (citing United States v. Loy,

9

191 F.3d 360, 365 (3d Cir. 1999); United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993)).

We exercise plenary review over a district court's denial of a motion for acquittal based on the sufficiency of the evidence, "applying the same standard as the district court." United States v. Silveus, 542 F.3d 993, 1002 (3d Cir. 2008) (citing United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005)). Accordingly, "[o]ur standard of review is highly deferential." United States v. Helbling, 209 F.3d 226, 238 (3d Cir. 2000).

## III. ANALYSIS

### A. Admission of Physical Evidence

Waters contends that the District Court erred by denying the motion to suppress the evidence obtained through the search of his residence because facts set forth in the search warrant failed to establish probable cause. Specifically, Waters asserts that the evidence before the Magistrate Judge, who issued the search warrant, did not provide sufficient facts to support a reasonable belief that any instrumentalities or proceeds from the robbery would be found in Waters's apartment. Hence, there was no basis to conclude probable cause to search existed.

The Fourth Amendment to the Constitution of the United States prohibits unreasonable searches and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. A search is per se unreasonable, subject to a few limited exceptions, unless it is effectuated with a

warrant based on probable cause. Katz v. United States, 389 U.S. 347, 357 (1967). "[S]uppression of evidence 'is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority.'" Hodge, 246 F.3d at 307 (quoting United States v. Williams, 3 F.3d 69, 74 (3d Cir. 1993)). As the reviewing court, we must "simply []ensure that the magistrate had a 'substantial basis for ... concluding' that probable cause existed." Illinois v. Gates, 462 U.S. 213, 239 (1983) (quoting Jones v. United States, 362 U.S. 257, 271 (1960)). "A magistrate may find probable cause when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Miknevich, No. 09-3059, --- F.3d ----, 2011 WL 692973, at *3 (3d Cir. March 1, 2011) (quoting Gates, 462 U.S. at 238). Unless the government proves that an exception is met, the exclusionary rule developed in Weeks v. United States, 232 U.S. 383 (1914), precludes the use of evidence obtained pursuant to an unreasonable search in a federal criminal proceeding against the victim of the illegal search. Id.; Fagan v. City of Vineland, 22 F.3d 1296, 1317 (3d Cir. 1994); United States v. Herrold, 962 F.2d 1131, 1137 (3d Cir. 1992).

There was significant evidence from which the Magistrate Judge could have concluded that there was a fair probability that evidence of the robbery would be found in Waters's apartment. The search warrant affidavit reported that police officers had not yet recovered the firearm used in the robbery and that the female driver of the Honda Accord and the Eagle Vision had eluded police by driving away in the Eagle Vision. The

11

affidavit stated that the Eagle Vision was found parked on a street near Waters's apartment and close to the area where police apprehended Waters.

The affidavit also reported that Goodman's black bag, which had been stolen in the robbery, was found in a trash can on the block where the Eagle Vision was parked. The affidavit provided a substantial basis for concluding that the female driver, who police were attempting to locate based on her role in the robbery, might have taken the firearm used in the robbery to Waters's apartment or that she might be at the apartment.[5] The Magistrate Judge was also entitled to give considerable weight to the affiant's conclusions regarding where evidence of the crime was likely to be found because the affiant was an experienced police officer. Hodge, 246 F.3d at 307. The Magistrate Judge had a substantial basis for finding probable cause.[6]

Because the Magistrate Judge had a substantial basis for finding probable cause, the evidence seized during the search of Waters's apartment is admissible. The District Court did not err by denying the motion to suppress this evidence.

---

[5] Waters asserts that the search warrant did not have probable cause because he did not have the opportunity to return to or conceal anything in his apartment due to his arrest, which shortly followed the robbery. Waters's inability to return to his apartment is immaterial, particularly, since the affidavit contained information supporting the inference that the female driver of the cars used in the robbery probably did have the opportunity to return to the apartment.
[6] We need not reach Waters's argument that the police officers' reliance on the warrant was unreasonable such that the good faith exception was not triggered because the Magistrate Judge had a substantial basis for finding probable cause for the warrant. See Miknevich, 2011 WL 692973, at *3.

12

B. Admission of Identification Testimony by Joel Goodman and Aaron Watkins

Waters argues that the District Court erred by admitting identification testimony of Goodman and Watkins because those one-on-one, post-arrest identifications were unnecessarily suggestive and created a substantial risk of misidentification, such that they violated Waters's Fifth Amendment right to due process.

An identification procedure violates Fifth Amendment due process if it "is both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification." United States v. Brownlee, 454 F.3d 131, 137 (3d Cir. 2006); see also Manson v. Brathwaite, 432 U.S. 98, 106–07 (1977) (a "suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability"). "Unnecessary suggestiveness 'contains two component parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures.'" Brownlee, 454 F.3d at 138 (quoting United States v. Stevens, 935 F.2d 1380, 1389 (3d Cir. 1991)). Reliability is the "linchpin in determining the admissibility of identification testimony." Manson, 432 U.S. at 114. To determine whether an identification was reliable, we consider the totality of the circumstances including:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and confrontation.

Brownlee, 454 F.3d at 139 (citing Neil v. Biggers, 409 U.S. 188, 198–99 (1972)).

13

The identification procedure at issue in <u>Waters</u> is a "show-up," where an individual is presented to a witness for identification. "[A] show-up procedure is inherently suggestive because, by its very nature, it suggests that the police think they have caught the perpetrator of the crime." <u>Id.</u> (citing <u>Stovall v. Denno</u>, 388 U.S. 293, 302 (1967)). However, "as <u>Stovall</u> makes clear, the admission of evidence of a showup without more does not violate due process." <u>Biggers</u>, 409 U.S. at 199.

### 1. Goodman's Identification

Waters argues that the procedure used to garner Goodman's identification was unnecessarily suggestive because less suggestive procedures were available. Waters asserts that the identification was unduly suggestive because three officers escorted Waters into the hospital room and the officers prefaced the show-up by noting that Waters was a "person of interest." In other words, Goodman knew that Waters was not a hospital patient. Waters contends that "there was no indication that Mr. Goodman's injuries were life threatening" because the bullet struck no vital organs. Waters argues that the identification is not sufficiently reliable because Goodman saw the perpetrator's face for four to seven seconds, gave a vague, inaccurate description of the perpetrator, and then was not completely sure about identifying Waters an hour after the robbery.

Similar to any other show-up procedure, the show-up procedure for Goodman's identification of Waters was suggestive because a show-up procedure is inherently suggestive. <u>Brownlee</u>, 454 F.3d at 138 (citing <u>Stovall</u>, 388 U.S. at 302). Officers brought Waters in for identification while he was handcuffed and no other "suspect" was

14

presented to Goodman. Lieutenant DiGiuseppe testified, however, that Goodman was in a room "where extremely critical people are worked on" and that he thought Goodman "might not make it" because he appeared to be in "very critical" condition due to the bleeding and the nature of the gunshot wound.[7] (Appellee's Supp. App. at 384–87.) This identification procedure was not unnecessarily suggestive because Goodman suffered a serious injury and officers were not certain that Goodman would survive the incident to be able to identify Waters in a lineup at a police station. Thus, there was a good reason for failing to resort to a less suggestive procedure. See Stovall, 388 U.S. (holding that a suggestive show-up was "imperative" where it was not clear how long the person making the identification would live; she was not able to visit the jail; taking the defendant to the hospital room was the only feasible procedure; and a line-up at the police station was not possible); compare with Brownlee, 454 F.3d at 138 ("there is no reason evident why Brownlee and the witnesses could not have been taken to the police station for a less suggestive line-up or photo array").

Even if the identification procedure were unnecessarily suggestive, it did not create a substantial risk of misidentification when considering the totality of the circumstances. Although the witness did not see the perpetrator for an extremely long period of time during the robbery, the amount of time and Goodman's clear view of the perpetrator's face were sufficient for Goodman to give a fairly accurate description to the police, even while he was injured at the crime scene. Moreover, the identification was

_____

[7] Lieutenant DiGiuseppe also testified that he knew Goodman's "condition was very, very serious" and "life threatening." (Appellant's App., Vol. 2, at 205a.)

made within fifteen minutes to an hour of the robbery, and Goodman was "98 percent sure" of the identification. See Biggers, 409 U.S. at 201 (finding that there was "no substantial likelihood of misidentification" when the identification occurred seven months after the crime); Manson, 432 U.S. 114–16 (finding that the indicators of the witness's ability to make an accurate identification, including correct identification of race, height, hair, and facial structure, were not outweighed by the corrupting effect of the challenged identification). Thus, the District Court properly denied Waters's motion to suppress Goodman's identification testimony.

### 2. Watkins's Identification

Waters argues that the procedure used to garner Watkins's identification violated the Constitution because it was unduly suggestive and there was no good reason for not using less suggestive procedures. Waters asserts that the identification was unduly suggestive because, at the location of the identification, Watkins saw the getaway vehicle and, then, officers presented Waters in handcuffs, bringing him out of a police vehicle. Waters argues that this identification is not sufficiently reliable because Watkins saw the perpetrator's face for four to seven seconds at the crime scene and he gave a generalized, inaccurate description of the perpetrator.

Similar to any other show-up procedure, the show-up procedure for Watkins's identification of Waters was suggestive because a show-up procedure is inherently suggestive. Brownlee, 454 F.3d at 138 (citing Stovall v. Denno, 388 U.S. 293, 302 (1967)). This identification procedure was unduly suggestive because "there is no reason

16

evident why [Waters] and [Watkins] could not have been taken to the police station for a less suggestive line-up or photo array." Brownlee, 454 F.3d at 138.

The identification procedure, however, did not create a substantial risk of misidentification when considering the totality of the circumstances. Although Watkins did not see the perpetrator for a significantly long period of time during the robbery, the identification was reliable because Watkins's view of the perpetrator's face was sufficient for him to give a fairly accurate description to the police, the identification was made within seven to ten minutes of the robbery, and Watkins had no doubt in his mind that Waters was the man who shot Goodman. Thus, the District Court properly denied Waters's motion to suppress Watkins's identification testimony.

C. Sufficiency of the Evidence Regarding the Hobbs Act Violation

The Hobbs Act, 18 U.S.C. § 1951(a), under which Waters was convicted, prohibits a robbery or extortion that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a). This Court has rejected the argument that there must be "proof of a 'substantial effect' on commerce in an individual case in order to show a Hobbs Act violation." United States v. Urban, 404 F.3d 754, 766 (2005) (citing Clausen, 328 F.3d 708 (3d Cir. 2003)). Instead, we have adopted the approach of other circuits that "legislation concerning an intrastate activity will be upheld if Congress could rationally have concluded that the activity, in isolation or in the aggregate, substantially affects interstate commerce." Id. (quoting United States v. Robinson, 119 F.3d 1205, 1211 (5th Cir. 1997)). "[P]roof of a

17

de minimis effect on interstate commerce is all that is required" for a robbery or extortion to meet the Hobbs Act threshold.  Clausen, 328 F.3d at 711 (citations omitted).  "[S]uch a 'de minimis effect' in an individual Hobbs Act case need only be 'potential.'"  Urban, 404 F.3d at 766 (citing United States v. Haywood, 363 F.3d 200, 209–10 (3d Cir. 2004)); see also Haywood, 363 F.3d at 209–10 (a robbery or extortion has a sufficient nexus to interstate commerce to uphold a Hobbs case if it "produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential" (citation omitted)).  Pursuant to the depletion of assets theory, "[a] jury may infer that interstate commerce was affected to some minimal degree from a showing that the business assets were depleted."  Haywood, 363 F.3d at 210 (citation omitted); Urban, 404 F.3d at 765.

Waters asserts that the government failed to establish that the robbery of Goodman substantially affected interstate commerce because the robbery took place outside of the business.  Waters asserts that Goodman missing work due to his injuries and Goodman leasing his interest in the business was not sufficient to establish an effect on interstate commerce and that there was no evidence of any disruption of, or decrease in, business.  Thus, Waters alleges that the District Court erred by denying his Federal Rule of Criminal Procedure 29 motion for judgment of acquittal.

In reviewing sufficiency of the evidence under Federal Rule of Criminal Procedure 29, "'[w]e determine whether there is substantial evidence that, when viewed in the light most favorable to the government, would allow a rational trier of fact to

18

convict.'" United States v. Helbling, 209 F.3d 226, 238 (3d Cir. 2000) (quoting

Government of the Virgin Islands v. Charles, 72 F.3d 401, 410 (3d Cir. 1995)).

Waters's argument fails because a rational trier of fact could have found that the robbery had the required, potential de minimis effect on interstate commerce. Goodman's business involved interstate commerce by offering international and interstate money transfers. As Goodman entered his business, Waters robbed him of $108,700 that Goodman planned to use for his business payroll. The robbery involved "the depletion of assets of a person engaged in interstate commerce [that] has at least a 'potential' effect on that person's engagement in interstate commerce." Urban, 404 F.3d at 767. That the money was recovered after the crime does not change that the robbery had a potential, de minimis effect on interstate commerce by at least temporarily depleting Goodman of assets he planned to use for his business. Clausen, 328 F.3d at 711–12 (holding that evidence of robberies and attempted robberies of businesses involved in interstate commerce was sufficient to show that the robberies "affected or had the potential to affect interstate commerce").

Moreover, the robbery had an actual effect on interstate commerce. After the robbery, Goodman testified that he "just can't go back to [the business]" and the business closed temporarily while another check cashing agency obtained a license to run the business. (Appellee's Supp. App. at 46.) There is substantial evidence such that a rational trier of fact could conclude that Goodman's refusal or inability to return to the business and the temporary closure of the business are actual effects of the robbery,

19

regardless of how slight those effects may have been.  Thus, the evidence that the robbery affected interstate commerce was sufficient to convict Waters under the Hobbs Act.

D.  Exclusion of Joel Goodman's Statements to Police at the Robbery Scene

Waters contends that the District Court erred when it declined to allow defense counsel to question Officer McCabe regarding a statement, indicated in his report, that Goodman made to him shortly after the shooting — that he was robbed by two black men in their twenties.  The District Court rejected defense counsel's argument that the statement was admissible as an excited utterance.

1.  Excited Utterance

Federal Rule of Evidence 803(2) provides that an excited utterance is admissible despite the general inadmissibility of hearsay statements if it is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  FED. R. EVID. 803(2).  The elements this Court requires for a hearsay statement to constitute an excited utterance are: "(i) a startling occasion; (ii) a statement relating to the circumstances of the startling occasion; (iii) a declarant who appears to have had opportunity to observe personally the events; and (iv) a statement made before there has been time to reflect and fabricate."  United States v. Brown, 254 F.3d 454, 458 (3d Cir. 2001) (citing United States v. Mitchell, 145 F.3d 572, 576 (3d Cir. 1998); Miller v. Keating, 754 F.2d 507 (3d Cir. 1985)).

Waters asserts that Goodman's statement met every requirement for admissibility as an excited utterance under Rule 803(2).  Waters contends that, despite Goodman's

20

testimony to the contrary, Goodman was under the stress of excitement due to the robbery even though he may not have been conscious of his state of mind because almost any individual would be in a state of excitement shortly after being robbed and shot.

Goodman's hearsay statement is only admissible as an excited utterance if it was made while Goodman "was under the stress of excitement" caused by the startling event. Rule 803(2) requires that the statement be contemporaneous "with the excitement caused by the event." Brown, 254 F.3d at 460 (noting that the critical question is whether the statement "likely occurred during the period of excitement engendered" by the event). This Court considers evidence regarding the state of the declarant when we have examined whether a statement was admissible as an excited utterance. See, e.g., id. at 459–61 (holding that statements were excited utterances where "declarants were still visibly in an excited state" and appeared to be "very nervous" and "hopping around"). Goodman's testimony that he was calm and no longer in pain by the time he made the statement to Officer McCabe provides support for the District Court's conclusion that the statement does not qualify as an excited utterance because he was no longer under the stress of excitement even though a short period of time had passed since the robbery and shooting. Thus, the District Court did not abuse its discretion by finding that the statement was not admissible as an excited utterance.

## 2. Present Sense Impression

Waters argues that Goodman's statement is admissible as a present sense impression.[8] Defense counsel did not make this argument to the District Court and is raising it for the first time on appeal. As noted above, we can only review this alleged error if Waters "demonstrates that (1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; . . . (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings,'" Riley, 621 F.3d at 322 (quoting Marcus, 130 S. Ct. at 2164); and "(4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings," Johnson, 520 U.S. at 467.

Waters does not specifically assert the existence of any of the four conditions required for appellate review of an error not raised at trial. The District Court allowed defense counsel to question Officer McCabe about reporting that the perpetrators were two black males in their twenties and defense counsel did so. The only information that did not come in from Goodman's statement is that Goodman allegedly gave Officer

---

[8] Federal Rule of Evidence 803(1) provides that a present sense impression is admissible as an exception to the hearsay rule if it is a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." FED. R. EVID. 803(2). The requirements for a hearsay statement to be admitted as a present sense impression are that: "(1) the declarant must have personally perceived the event described; (2) the declaration must be an explanation or description of the event rather than a narration; and (3) the declaration and the event described must be contemporaneous." Mitchell, 145 F.3d at 576 (citing 5 J. McLaughlin, Weinstein's Federal Evidence § 803.03 (2d ed. 1997); 2 J. Strong, McCormick on Evidence § 271 (4th ed. 1992)).

22

McCabe that description of suspects. Given the substantial amount of evidence against Waters and that defense counsel questioned Officer McCabe about the descriptions he broadcasted, Waters has not established that the exclusion of the information that Goodman made the statement affected the outcome of the District Court proceedings. Thus, Waters has not demonstrated that this alleged error affected his substantial rights and this Court cannot exercise its discretion to review the forfeited alleged error.

## IV. CONCLUSION

For the reasons set forth above, we will affirm the District Court's judgment of conviction.