**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1394
_____

UNITED STATES OF AMERICA

v.

JAMAAL L. MIKE,
Appellant
_____

On Appeal from the District Court of the Virgin Islands,
Division of St. Thomas and St. John
(Crim. No. 3-09-cr-00036-001)
District Judge: Honorable Curtis V. Gómez
_____

Argued December 16, 2010

BEFORE: McKEE, *Chief Judge*, FUENTES and SMITH,
*Circuit Judges*

(Opinion Filed: August 23, 2011)

Jesse A. Gessin, Esq
Gabriel J. Villegas, Esq. **[ARGUED]**
Office of Federal Public Defender
P.O. Box 1327, 51B Kongens Gade
Charlotte Amalie, St. Thomas, USVI 00804

Thurston T. McKelvin, Esq.
Office of Federal Public Defender
P.O. Box 223450
Christiansted, USVI 00822

*Counsel for Appellant*

Nelson L. Jones, Esq. **[ARGUED]**
Office of United States Attorney
5500 Veterans Building, Suite 260
United States Courthouse
Charlotte Amalie, St. Thomas, USVI 00802-6924

      *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*.

      Appellant, Jamaal Mike, was convicted by a jury of aiding and abetting the receipt of a firearm acquired outside his state of residency, a violation of 18 U.S.C. § 922(a)(3) and § 924(a)(1)(D); and unauthorized possession of a firearm in violation of V.I. Code Ann. tit. 14, § 2253(a). He appeals these convictions, arguing that there were three problems with his trial. First, he says that the District Court erred when it failed to give use immunity to a co-defendant; second, he says that he is entitled to a judgment of acquittal because there was no evidence that the firearm he was convicted of possessing was capable of discharging ammunition; and finally, he says that he was entitled to a judgment of acquittal based on an affirmative defense under Virgin Islands law. We find these arguments unpersuasive and, for the reasons set forth below, affirm the judgment of the District Court.

I.

      On April 10, 2009, Fenyang Ouma Francis put down a deposit to purchase an AK-47 rifle and two 30-round magazines at Rieg's Gun Shop in Orlando, Florida. He completed the purchase the next day. Ten days later, on April 21, 2009, U.S. postal inspectors in San Juan, Puerto Rico, intercepted a package addressed to a man named Imon Thomas with a post office box in St. Thomas, Virgin Islands. Their investigation revealed that the package's return address was false and that the post office box in the shipping address was not registered to Imon Thomas. Intrigued, the postal inspectors x-rayed the package and saw a firearm inside.

After securing a search warrant, they opened the package and discovered an AK-47 covered in grease and two 30-round magazines. The postal inspectors then removed the weapon from the box and "dry fired" it to test whether it was operable. It was. After that, they removed the AK-47's firing bolt, placed it back in the box, and sent the firearm on its way to St. Thomas in a controlled delivery designed to apprehend the would-be owner.

The next day found the prospective gun owner, Jamaal Mike, travelling to the Frenchtown post office in St. Thomas with Lucas Reid, Jr., and Dwayne Hunte, a 17-year old juvenile that Mike and Reid had met along the side of the road. When the group arrived at the post office, Reid and Mike went inside while Hunte met his mother at a nearby McDonald's. After a few minutes Mike and Reid left the post office empty-handed, went back to Hunte, and drove to the Sugar Estate post office. There, Mike gave Reid a slip of paper with a tracking number on it. Reid and Hunte then entered the Sugar Estate post office to retrieve a package, but were told that the package was back at the Frenchtown post office. The group circled around to Frenchtown. When they arrived, Mike gave Hunte a slip of paper, this one with the name Imon Thomas written on it. Hunte and Reid went inside the post office and retrieved a card from a post office box belonging to Reid's father. Reid gave the card to Hunte, who stood in line and handed the card to a postal employee. When the employee brought Hunte a package, Hunte signed for it under the name Imon Thomas. Reid and Hunte then carried the package to Reid's car, where Mike was waiting. So were the police. Once the package was placed in the car, federal agents approached the vehicle and arrested Reid, Mike, and Hunte, none of whom had a license to possess a firearm.

Francis was also arrested. He subsequently pleaded guilty to shipping a firearm in the mail and to transferring a firearm to an out-of-state resident. During his plea negotiations, he told his attorney that neither Mike nor Reid knew what was in the package he addressed to Imon Thomas. Francis's attorney told the Government that Francis would testify on Mike and Reid's behalf and the Government

3

disclosed this fact to Mike and Reid. On October 19, 2009, Mike subpoenaed Francis.

Francis moved to quash the subpoena the very next day, October 20. That same day—the first day of the trial—Mike asked for a continuance to investigate Francis's offer to testify. The District Court denied the motion. Mike then asked the Court to grant Francis use immunity. The Court denied the motion, concluding that Francis's testimony would not be clearly exculpatory: "I don't think there's any basis for [use immunity] at this point. It sounds like it would be a credibility issue. And that's something that would take it, I think, out of the realm of clearly exculpatory, which I think is a baseline requirement in order to, for the Court to even go any further." (App. 174-75). Mike moved for a judgment of acquittal at the close of the government's case and again after the jury returned a verdict of guilty on both counts. The District Court denied the motions. Mike was subsequently sentenced to fifty-one-month sentences of imprisonment on each of the counts of conviction, to be served concurrently.

Mike appeals the denial of each of the above motions. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231 and 48 U.S.C. § 1612. We have jurisdiction under the authority provided by 28 U.S.C. § 1291.

II.

Mike argues on appeal that the District Court was wrong to deny the request to give Francis use immunity. We review the District Court's factual determinations regarding the likely effect of undisclosed information for clear error and its ultimate decision not to immunize a defense witness for an abuse of discretion. *See United States v. Perez*, 280 F.3d 318, 348 (3d Cir. 2002).[1] We see no error. The District Court did

---

[1] Our decision in *United States v. Thomas*, 357 F.3d 357 (3d Cir. 2004) did not set forth the standard of review. In that case, the appellant failed to present his judicial immunity argument to the district court. *Id.* at 362 (citing Fed. R. Crim. P. 52(b)); *see also id.* at 365-66. "Failure to object at trial, absent plain error, constitute a waiver of the issue for post-trial purposes." *United States v. Tiller*, 302 F.3d 98, 105 (3d

4

not abuse its discretion when it declined Mike's request to grant Francis use immunity because the failure to grant Francis immunity did not deprive Mike of his constitutional due process right to present clearly exculpatory evidence necessary to obtain a fair trial.

The Fifth Amendment to the United States Constitution states that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. In *Chambers v. Mississippi*, the Supreme Court recognized that this due process right is "in essence, the right to a fair opportunity to defend against the State's accusations." 410 U.S. 284, 294 (1973). For this reason, the *Chambers* court held that Mississippi's strict rules of evidence, which prevented Leon Chambers from cross-examining a witness who had confessed to the same crime and prevented him from entering into evidence other admissions of the witness's guilt, violated Chambers's right to due process by effectively denying him a fair trial. *Id.* at 285, 302.

*Chambers* recognizes the proposition that criminal defendants possess a "due process right to have clearly exculpatory evidence presented to the jury, at least when there is no strong countervailing systemic interest that justifies its exclusion." *United States v. Herman*, 589 F.2d 1191, 1204 (3d Cir. 1978). That recognition proved to be the answer to the question presented in *Government of the Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980): If a defendant's right to due process can be violated by strict rules of evidence that prevent a defendant from presenting clearly exculpatory evidence to the jury, can that same right also be violated by the failure to affirmatively grant immunity to an available defense witness who will not testify under grounds of self-incrimination when the witness is likely to offer clearly exculpatory testimony? *Smith* said "yes," observing that the latter violation is "not different in substance than the violation found in *Chambers.*" *Id.* at 970. Indeed, cases like *Chambers*; *Gideon v. Wainwright*, 372 U.S. 335 (1963) (holding that an indigent defendant cannot have a fair trial

_____

Cir. 2002). Thus, in *Thomas*, the scope of our review was limited to plain error.

5

without being provided counsel) and *Brady v. Maryland*, 373 U.S. 83 (1963) (holding that a defendant cannot present an effective case when the government suppresses material exculpatory evidence), recognize that a major purpose of a criminal trial is to search for the truth, and that this purpose is not advanced by rules that "turn the trial into a mere 'poker game' to be won by the most skilled tactician." *Smith*, 615 F.2d at 971 (quoting *Williams v. Florida*, 399 U.S. 78, 82 (1970)). Thus, *Smith* highlighted the long-standing principle that the Fifth Amendment's Due Process Clause is violated when a defendant is deprived of "clearly exculpatory evidence necessary to present an effective defense." *Id.*

After precisely identifying the right at issue, the *Smith* court focused on the means of protecting it, making the common-sense observation that "[a]ny remedy . . . must take into account the fact that a retrial would be meaningless unless the evidence in issue may be compelled." *Id.* In cases where a defense witness invokes the Fifth Amendment for fear of self-incrimination, the only way to compel this evidence is to grant immunity. *Id. See Kastigar v. United States*, 406 U.S. 441, 462 (1972) (concluding that use immunity "is coextensive with the [Fifth Amendment] privilege and suffices to supplant it"). For this reason, the *Smith* court drew upon precedents describing the "inherent judicial power to grant witness immunity in order to vindicate constitutional rights" and concluded that judicially-granted immunity could serve to remedy these types of due process violations. *Smith*, 615 F.2d at 971 (citing, among other cases, *Simmons v. United States*, 390 U.S. 377 (1968)). However, because of the "unique and affirmative nature of the immunity remedy and fundamental considerations of separation of powers, grants of immunity to defense witnesses must be bounded by special safeguards and must be made subject to special conditions." *Id.* The *Smith* court imposed five such conditions, emphasizing that each must be met before the remedy of judicially-granted immunity is available:

> [1] immunity must be properly sought in the district court; [2] the defense witness must be available to testify; [3] the proffered testimony must be clearly exculpatory; [4] the testimony must be essential; and [5] there must be no

6

strong governmental interests which countervail
against a grant of immunity.

*Id.* at 972.

Mike's appeal is focused on the availability of the remedy of judicially-granted immunity. The parties agree that the first two conditions for granting the remedy are satisfied. The battle is over the last three, with particular emphasis on the condition that the proffered testimony be "clearly exculpatory."

Our decision in *United States v. Thomas*, 357 F.3d 357 (3d Cir. 2004), guides our analysis as to whether Francis's testimony was clearly exculpatory. In that case, the namesake defendant was arrested after drugs were found behind the glove box of his car. *Id.* at 359. Thomas's theory was that the car dealer who sold him the car, and the car dealer's assistant, planted the drugs. *Id.* at 365. He called each of them to testify, but they invoked the Fifth Amendment and refused. *Id.* On appeal, Thomas argued that the district court should have granted the two witnesses immunity. Reviewing for plain error, we concluded that the district court properly declined to offer immunity because the witnesses' testimony would not have been "clearly exculpatory." *Id.* We observed that judicial immunity may be properly denied when the exculpatory nature of testimony is "at best speculative." *Id.* (quoting *United States v. Ammar*, 714 F.2d 238, 251 n.8 (3d Cir. 1983)). In Thomas's case, the testimony of two other witnesses "undercut" his theory that drugs were planted and "undermine[d]" his assertion that he didn't know there were drugs in his car. *Id.* at 365 -66. Accordingly, "[b]ecause a credibility determination would have been required in order to determine which parties were more credible," the testimony of the witnesses Thomas wanted immunized "would not have been 'clearly exculpatory[.]'" *Id.* at 366.

The government says that the same is true in this case. Francis would have testified that he did not tell Mike what was in the package Mike helped pick up at the Frenchtown post office in the Virgin Islands. However, Hunte testified that Mike gave him a slip of paper with the name Imon Thomas written on it in order to identify the package he wanted. He further testified that, after their arrest and while

7

detained, Mike told Hunte "all it is, is a haircut," and that Hunte understood this to mean that Mike wanted Hunte to take the rap because all it would mean for Hunte was a juvenile conviction and a stay at the "Boy's Home." (App. 171-72). According to the government, because the jury could have inferred from Hunte's statements that Mike knew what was in the package, Francis's testimony to the contrary would simply have created an issue of credibility, which it contends is not enough under *Thomas* to meet the condition that testimony be clearly exculpatory.

The Government's reading of *Thomas* is expansive. Its view seems to be that testimony is never clearly exculpatory if the jury must weigh the credibility of the immunized witness against the credibility of other witnesses. This is not the law. In *Smith* we said that "[i]mmunity will be denied if the proffered testimony . . . is found to relate *only* to the credibility of the government's witnesses," 615 F.2d at 972 (emphasis added), and in *Ammar*, we remarked that judicial immunity is improper when the proffered testimony is "at best speculative," 714 F.2d at 251 n.8. Nothing in these cases rules out the possibility that a defense witness's testimony can be clearly exculpatory when it helps to establish, among other things, that a government witness's testimony is not credible. Of course, we found no error in the failure to grant immunity in *Thomas* "[b]ecause a credibility determination would be required in order to determine which parties were more credible," 357 F.3d at 366, but this was not the sole reason for our decision. Elsewhere, we emphasized that there was other evidence to "undercut" and "undermine" Thomas's theory of the case. *Id.* at 365-66.

Here, as in *Thomas*, there is evidence in the record undercutting the testimony Francis might have given and Mike's theory of the case. Hunte's testimony is one such piece of evidence. Mike's phone records are another. At trial, a postal inspector testified that Francis, Mike and Reid exchanged numerous telephone calls on the days the AK-47 was purchased, the day the AK-47 was sent into the mail, and the day the AK-47 was picked up at the post office. (App. 299-307). This testimony, too, undermines Mike's claim of ignorance. Thus, in Mike's trial, as in Thomas's, the jury was confronted with more than just a credibility determination. In

both cases, the testimony from the witness the defendant wanted immunized may have helped the defendant, but it was far from necessary to ensure a fair trial.

Since the five *Smith* conditions had not been satisfied, the District Court could not have granted immunity to Francis. A district court cannot abuse its discretion when it fails to give a remedy that is not in its power to give.

Our holding should not be interpreted to foreclose judicially-granted immunity in similar cases, so long as the five *Smith* conditions are satisfied. Ultimately, the question of whether clearly exculpatory evidence is necessary to present an effective defense is a decision calling upon the sound judgment of the district court judge in a position to listen to the witnesses and evaluate the tenor of trial narratives. Our role is not to substitute the judgment we might reach after reading the record for the judgment of a district court judge who actually saw that record develop live in a courtroom. The law tolerates differences of opinion and our role on appeal is simply to make sure that those differences stay within certain bounds. In this case the boundaries of acceptable decision making are defined by the abuse of discretion standard, which compels us to accept the considered judgment of the District Court unless its decision is "arbitrary, fanciful, or clearly unreasonable." *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010) (quoting *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009)). Based on the record presented in this appeal, the District Court's ruling was clearly within the bounds of reasonable decision making because there was no indication that Mike's right to a fair trial was in jeopardy. The District Court did not abuse its discretion when it declined to grant Francis use immunity.

III.

Mike also says that the District Court was wrong to deny his motion for a judgment of acquittal because he did not possess a "firearm" as that word is defined by Title 23, section 451(d) of the Virgin Islands code. We exercise plenary review over the grant or denial of a motion for acquittal under Federal Rule of Criminal Procedure 29, applying the same standard as the District Court. *United States v. Silveus*, 542 F.3d 993, 1002 (3d Cir. 2008). Thus,

9

we look to determine whether the evidence is sufficient to support the conviction, Fed. R. Crim. P. 29, but in doing so, we are mindful that "[i]t is not for us to weigh the evidence or to determine the credibility of the witnesses." *United States v. Voigt*, 89 F.3d 1050, 1080 (3d Cir. 1996) (quoting *United States v. Schoolcraft*, 879 F.2d 64, 69 (3d Cir. 1989)). Instead, we review the evidence in the light most favorable to the government and sustain the verdict "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998) (quoting *Voigt*, 89 F.3d at 1080).

In the Virgin Islands, "[w]hoever, unless otherwise authorized by law . . . possesses . . . either actually or constructively . . . any firearm, as defined in Title 23, section 451(d) of [the Virgin Islands] code" is subject to imprisonment. V.I. Code Ann. tit. 14, § 2253(a). A firearm, as defined by § 451(d), is "any device by whatever name known, capable of discharging ammunition by means of gas generated from an explosive composition, including any air gas or spring gun or any 'BB' pistols or 'BB' guns that have been adapted or modified to discharge projectiles as a firearm." V.I. Code Ann. tit. 23, § 451(d).

In his brief, Mike argues that his motion should have been granted because the testimony at trial showed that the AK-47 was delivered without its firing bolt and was therefore inoperable. However, at oral argument, Mike shifted tack, instead arguing that the problem was that there was no evidence at trial showing that the weapon had ever been test fired and shown to be capable of firing a bullet. The record demonstrates otherwise. When asked at trial whether he had test-fired the weapon, postal inspector Mitchell Perez answered that "we dry-fired it." (App. 148). He also testified that the AK-47 presented to him at trial was the same one he found inside the package addressed to Imon Thomas when it was intercepted in Puerto Rico. Later in the trial, Senior Special Agent Felix Rios, from the Bureau of Alcohol, Tobacco, Firearms and Explosives testified that he test-fired that same weapon in August 2009 and concluded "that the weapon was operable, and that it was, will fire in semiautomatic mode." (App. 157.)

10

Viewing the above evidence in the light most favorable to the government, we conclude that a rational jury could have concluded that the AK-47 was capable of discharging ammunition. We thus affirm the District Court's order denying Mike's Rule 29 motion.

IV.

As stated previously, the Virgin Islands prohibits possession of a firearm "unless otherwise authorized by law." V.I. Code Ann. tit. 14, § 2253(a). In *United States v. McKie*, we decided that § 470 of Title 23 of the Virgin Islands code essentially "authorized by law" the possession of a firearm in the period before a person is required to report the receipt of the firearm to the Virgin Islands Police Commission. 112 F.3d 626, 631 (3d Cir. 1997). In doing so, § 470 created an affirmative defense to the crime of unlawful possession. *Id.* When the defendant in *McKie* was arrested, § 470 gave him 24 hours to report the fact that he had obtained a firearm, but by the time his case was presented to this Court the statute had been amended into its current form to provide that firearms obtained from outside the Virgin Islands must be reported "immediately." *Id.* at 632.

Mike argues that his motion for a judgment of acquittal should have been granted, or that the jury should have been instructed on his affirmative defense under § 470, because the trial testimony demonstrated that he was arrested "immediately" after obtaining the AK-47. The Government counters that the evidence presented at trial makes it obvious that Mike had absolutely no intention of reporting the gun, "immediately" or any time thereafter. To which Mike responds that *McKie* made clear that a defendant does not need to prove intent to report in order to obtain the § 470 affirmative defense. *Id.* at 632 ("If the legislature meant to include 'intent to report' as part of the defense, it did not say so.").

We agree with the Government that Mike was not entitled to a judgment of acquittal or a jury instruction on the affirmative defense. In *McKie,* we explained that "'intent to report' was not an element of the affirmative defense of firearm possession for less than twenty-four hours as it existed under § 470, *before its recent amendment*." *Id.*

11

(emphasis added). When the Virgin Islands legislature substituted the 24-hour period to report in § 470 for a time period defined by the word "immediately," it fundamentally changed the nature of the affirmative defense. The *McKie* court intimated as much, explaining that "the legislature wanted to close the loophole created by the twenty-four hour grace period." *Id.* (citing Hearing on Bill No. 21-0219 to amend Title 23, Section 470 of the Virgin Islands Code, Reg. Sess. (V.I. Aug. 29, 1996)). "Immediately" means "instantly; at once" or "with no object or space intervening." Webster's Unabridged Dictionary 957 (2d ed.1998). By using this term the Virgin Islands legislature accomplished its objective, eliminating the use of § 470 as a viable affirmative defense in the vast majority of cases by collapsing the time period for reporting into nothing.

The only way a person can "immediately" report the receipt of a firearm is to conscientiously set out with that intent and provide the report when the firearm is obtained. The evidence at trial revealed that the AK-47 was slathered in grease to mask its scent from curious canines, that the gun was inside a package addressed to a fictitious person named Imon Thomas, and that Mike convinced a juvenile to pick up the package for him under the assumed name of the fictitious addressee. The evidence was clear that Mike had no intent to "immediately" report the receipt of the firearm. Without such evidence, Mike was not entitled to a jury instruction on the affirmative defense and, even if one had been given, no rational trier of fact could have used it as the basis for an acquittal. *See Government of the Virgin Islands v. Carmona*, 422 F.2d 95, 101 (3d Cir. 1970) (concluding that defendant was not entitled to jury instruction where there was no evidence to support it).

## V.

We find no merit to Mike's argument that the District Court abused its discretion when it failed to grant use immunity to a co-defendant. We similarly find unpersuasive the argument that Mike did not possess a "firearm" as that word is defined by Virgin Islands statute. And there is no evidence in the record that would have warranted a jury instruction on an affirmative defense under V.I. Code. Ann.

12

Tit. 23, § 470.  For all of the foregoing reasons, the judgment of the District Court is affirmed.

<u>McKee</u>, Chief Judge, concurring in part and dissenting in part:

Although I agree with the majority's conclusion that there was sufficient evidence to convict Jamaal Mike of being in possession of a firearm, I write separately to clarify how courts should interpret the definition of "firearm" under 23 V.I.C. § 451. In addition, I can not agree that the district court properly denied use immunity because I believe that circumstantial evidence that does not directly contradict the testimony of a proposed defense witness is insufficient to negate the otherwise clearly exculpatory nature of such testimony. I therefore believe that the district court erred in not granting use immunity pursuant to our decision in *Gov't of Virgin Islands v. Smith*, 615 F.2d 964, 972 (3d Cir. 1980)). Accordingly, I dissent from my colleagues' use immunity analysis and thus can not concur in the judgment.

## I. The Definition of a Firearm Under VI Law

The facts relevant to Mike's receipt of a "firearm" were not disputed at trial: a ballistics expert testified that the gun that was mailed to Mike was operable when law enforcement agents intercepted it. An agent then removed the bolt from the gun, rendering it inoperable. The gun was then forwarded to Mike, and the bolt was mailed separately to another government official. It was not included in the package Mike received. Therefore, when Mike received the firearm, it was no longer "operable."

Mike argues that because the firearm was inoperable when he received it, he cannot be charged with violating 14 V.I.C. § 2253(a) [1], which criminalizes unauthorized

---

[1] The statute reads as follows:

> (a) Whoever, unless otherwise authorized by law, has, possesses, bears, transports or carries either, actually or constructively, openly or concealed any firearm, as defined in Title 23,

possession of a firearm. A firearm is defined under the Virgin Islands Code as follows:

> (d) "Firearm" means any device by whatever name known, *capable of discharging ammunition* by means of gas generated from an explosive composition, including any air gas or spring gun or any "BB" pistols or "BB" guns that have been adapted or modified to discharge projectiles as a firearm.

23 V.I.C. § 451 (emphasis added).

Mike relies on two cases to argue that a firearm must be operable under 23 V.I.C. § 451(d) to sustain a conviction for illegal possession of a firearm.[2] Neither is persuasive. In *Virgin Islands v. Henry,* 232 F. App'x. 170 (3d Cir. 2007) (unpublished), we simply noted in the procedural history that:

> the Appellate Division [of the Virgin Islands] . . . agreed [with the petitioner] that the government had failed to offer evidence showing that one of the guns retrieved at the scene was operable (i.e., capable of discharging ammunition). Accordingly, the Court reversed Henry's conviction with respect to the count

---

> section 451(d) of this code, loaded or unloaded, may be arrested without a warrant[.]

14 V.I.C. § 2253(a)

[2] The government does not dispute that § 451(d) requires that a firearm be capable of firing ammunition. It counters, however, that the firearm was operable when it was mailed, and "but-for" its intervention, the firearm would have been operable when Mike received it. The government cites no cases in its favor, and a review of relevant case law finds no support for this proposition.

2

involving the gun that was not shown to be operable and affirmed his conviction with respect to the remaining gun [which was shown to be operable.]

*Id.* at 173. However, in reaching our holding we did not determine whether a firearm must be operable in order to be a firearm under 23 V.I.C. § 451(d). In the second case, the District Court of the Virgin Islands held: "To prove this charge [possession of an unlicensed firearm], the government must show that the firearm was operable." *Virgin Islands v. Albert*, 1980 U.S. Dist. LEXIS 14466 (D.Ct. V.I. 1980) (*citing* 14 V.I.C. § 2253(a) and 23 V.I.C.. § 451(d)). Neither case is analogous to the situation here where a firearm that was capable of discharging ammunition is subsequently rendered inoperable by law enforcement officials and then forwarded to a defendant to take possession of it as part of a criminal investigation.[3]

I agree that the gun that Mike received qualifies as a "firearm," but my analysis of that issue diverges a bit from that of my colleagues. The majority writes:

In his brief, Mike argues that his motion should have been granted because the testimony at trial showed that the AK-47 was delivered without its firing bolt and was therefore inoperable. However, at oral argument, Mike shifted tack, instead arguing that the problem was that there was no evidence at trial showing that the weapon had ever been test fired and shown to be capable of firing a bullet. The record demonstrates otherwise.

---

[3] Mike's list of cases is not exhaustive. Although other cases similarly use the word "operable" and "capable of discharging ammunition" interchangeably, none of those cases are binding.

Maj. Op. at 18. My colleagues then conclude that because there was evidence that the firearm was operable when the government tested it, a rational jury could have concluded that the AK-47 was capable of discharging ammunition.

Although I agree with the majority's conclusion, I do not think it is at all relevant that defense counsel "shifted tack" at oral argument. Although Mike's attorney stated that there was no evidence regarding whether the weapon was ever "dry-fired" by the government, it appears that he was merely confused about the record. Mike's counsel did not concede the issue in his brief.

Accordingly, I think we should take this opportunity to decide directly that the Virgin Islands statute applies to a weapon that is capable of firing when placed into the mail, but subsequently is rendered inoperable by law enforcement agents before sending it on its way to a defendant in order to make a controlled delivery. Addressing the issue more directly will eliminate any possibility that law enforcement agents may believe they have to place a "live" weapon into the mail in order to prove a violation of this and similar statutes.

To establish a violation of § 2253(a), the government must prove the following two elements beyond a reasonable doubt: (1) the defendant did possess, bear, transport or carry, "either, actually or constructively, openly or concealed" (2) "any firearm, as defined in Title 23, section 451(d) of this code, loaded or unloaded." 23 V.I.C. § 451(d) defines a firearm as "any device by whatever name known, capable of discharging ammunition by means of gas generated from an explosive composition . . . ."

However, § 451(d) does not require that a firearm be "operable." Instead, its plain language requires only that the device be "*capable* of discharging ammunition by means of gas generated from an explosive composition . . . ." 23 V.I.C. § 451(d) (emphasis added).

4

The word "capable" is not synonymous with the word "operable." Merriam-Webster's dictionary defines "capable" as "having traits conducive to or features permitting." Merriam Webster Online Dictionary, http://www.merriam-webster.com/dictionary/capable (last visited June 21, 2011). The Oxford English Dictionary ("OED") defines "capable" as "having room or capacity for." Capable Definition, Oxford English Dictionary (Online Version), http://www.oed.com/view/Entry/27354 (last visited June 21, 2011).

The OED defines "operable" as "able to be operated." Operable Definition, Oxford English Dictionary (Online Version), http://www.oed.com/view/Entry/131732 (last visited June 21, 2011). Thus, a firearm may be "*capable*" of discharging ammunition, but not "*operable*," if it has the potential to fire ammunition, or the "capacity for" discharging ammunition, but cannot do so at the relevant time.

Here, the AK-47 was certainly *capable* of discharging ammunition, as the government's evidence established. Although the AK-47 that Mike received lacked one part — the bolt — the firearm still had "features permitting" it to discharge ammunition, including a barrel, functioning trigger, piston, hammer, buttstock, grip and magazine. All of these were in perfect working order. Although a firearm that is missing a bolt may not be operable until the missing bolt is replaced, it nevertheless has the "capacity for" discharging ammunition.

More importantly, requiring such a firearm to be "operable" would violate the plain language of 23 V.I.C. § 451(d), which explicitly states that a gun need not be loaded in order to be considered a firearm. An unloaded firearm is "inoperable," since it cannot discharge ammunition. Section 451(d)'s language, permitting a device to be considered a firearm even if it is unloaded, reflects an overwhelming legislative concern that the statute not be limited to firearms that could be fired at a given moment. Rather, the legislature was clearly concerned about the *potential* for firing

5

ammunition and crafted the definition of "firearm" accordingly.

Interpreting the statute in this manner does not broaden 23 V.I.C. § 451(d) to include weapons that should not fairly be considered firearms. Neither a scope, nor even the missing bolt without the rest of the weapon, would constitute a firearm under § 451(d), because such parts and accessories do not have the *capacity* to fire ammunition. They may facilitate firing a weapon, but they are not capable of inflicting harm unless affixed to the actual firearm or integrated into it. Doing so is what allows the weapon to function as a "firearm;" and attaching such parts or accessories or integrating them into the weapon results in an altogether different "device" than such items standing alone.[4]

In sum, I believe that the government need only prove that the device MIke received was "capable of discharging ammunition." in order to prove a violation of 14 V.I.C. § 2253(a). The testimony that agents were able to successfully "dry fire" the gun that Mike received was sufficient to prove that here. Removing the bolt rendered the AK-47 inoperable, but the weapon was still "capable" of firing ammunition. It was no less capable of that when Mike received it than if it had arrived unloaded but fully intact.

---

[4] Additionally, the more restrictive definition of "firearm" urged by Mike yields illogical results as evidenced here. This statute is clearly aimed at the illegal flow of guns and the carnage and devastation they cause. Mike's interpretation of the statute would have required law enforcement officers who knew that a package contained an assault weapon to place that fully functioning weapon back into the stream of commerce in order to successfully complete an investigation while hoping that it would not be lost, delivered to the wrong party, or fall into the hands of minors or criminals along the way. It is inconceivable that any legislature would intentionally require such a result in enacting this kind of statute.

## II. Use Immunity

Mike also appeals the district court's refusal to grant use immunity to Fenyang Francis, who purportedly told his attorney that Mike did not know that there was a gun in the package he received. The majority finds that the district court did not abuse its discretion because Francis's testimony is not "clearly exculpatory." I disagree.

For testimony to be "clearly exculpatory," it cannot be "undercut by . . . prior inconsistent statement[s]," *United States v. Perez*, 280 F.3d 318, 350 (3d. Cir 2002), or otherwise require a jury to make a credibility determination, *United States v. Thomas*, 357 F.3d 357, 365 (3d Cir. 2004).

The majority relies heavily on *Thomas* in affirming the district court's denial of use immunity. There, we found that the district court properly denied use immunity to two witnesses whom Thomas wanted to call to present a theory that another person, James Stager, a car dealer, had planted drugs in his car. "[A]t least two other witnesses offered testimony that undercut Thomas' theory that Stager planted drugs in his car." *Id.* at 365.

The first witness was "Thomas' girlfriend, Heather Barr, [who] testified that . . . Thomas told her that he already knew that drugs were in his car [and] that Thomas attempted to remove the drugs from his car in the police impoundment lot and fled to State College in order to avert being arrested when the police found the drugs." *Id.* at 365-66. A second witness also undermined Thomas's argument that Stager had the opportunity to plant the drugs in Thomas's car because he testified that Thomas's car was not where Thomas claimed it was in his theory of the case.

Since the testimony Thomas wanted to produce through immunized witnesses was in direct conflict with Thomas's theory of the case, the jury would have had to decide whether to believe the witnesses whom Thomas wanted immunized, or two non-immunized prosecutorial witnesses. "Because a credibility determination would have

been required in order to determine which parties were more credible, [the testimony Thomas sought to admit] would not have been 'clearly exculpatory,' as required under *Smith.*" *Thomas*, 357 F.3d at 366 (referencing *Smith*, 615 F.2d at 972).

*Thomas* is distinguishable. That case reinforces the unremarkable notion that use immunity not be used as a license to commit perjury. Here, the circumstantial evidence that the government presented that Mike knew the contents of the box does not clearly undercut Francis's proffered testimony. In fact, Francis's testimony could explain the circumstantial evidence the government admitted in its case-in-chief. Unlike the testimony in *Thomas,* Francis's testimony here could have been accepted in a context that was completely compatible with evidence already admitted.

As part of its case, the government was required to prove that Mike knew that a gun was in the package he received. To prove this, the government presented two pieces of circumstantial evidence, which the majority cites as undermining the clearly exculpatory nature of Francis's potential testimony. First, the majority cites the fact that, after they were arrested, Mike told Hunte that all he would get was "a haircut," that is, go to juvenile detention. However, that only establishes that Mike knew *some type of contraband* was in the package, not that he knew it contained a gun. In theory, he could have believed he was receiving a shipment of drugs of some other kind of contraband. Therefore, Francis's testimony could have been accepted without requiring the jury to chose between two competing statements if the jury believed Francis.

Next, the majority points to multiple telephone calls between Francis and Mike confirming that the two communicated numerous times in the weeks surrounding the firearm shipment and often in the minutes before and after the purchase of the firearm and the shipment of the firearm. However, we do not know the content of these calls. Without more, I do not believe we can assume enough about the substance of those conversations to justify denying use

8

immunity. Although it is very easy to assume that Francis told Mike about the shipment of a firearm during at least one of those conversations, that should be an argument that is left for the jury to resolve after hearing all of the relevant evidence. In theory, Francis may have merely been confirming the receipt of contraband or the timing of the mailing of the package during those conversations.

We have found that the "clearly exculpatory" standard for a use immunity analysis is "similar [to the] analysis [that] applies to [an] alleged *Brady* violation." *United States v. Perez*, 280 F.3d 318, 348 (3d Cir. 2002). In *Perez*, we explained:

> Under *Brady*[,] . . . the suppression by the prosecution of evidence favorable to an accused warrants a new trial where "the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Evidence is material if there is a reasonable probability that, had it been disclosed, the result of the proceeding would have been different.

*Id.* at 348-49 (citations omitted).

It is hard to imagine evidence with a greater exculpatory potential than the person who shipped the package saying that Mike did not know it contained a gun. Of course, the jury would have been free to disregard that testimony if it thought that the other evidence established beyond a reasonable doubt that Mike knew he was receiving a gun, or if it otherwise found Francis lacking in credibility. "In *Smith* we said that '[i]mmunity will be denied if the proffered testimony . . . is found to relate only to the credibility of the government's witnesses,' and in *Ammar*, we remarked that judicial immunity is improper when the proffered testimony is 'at best speculative[.]'" Maj. Op. at 13 (citing *Smith*, 615 F.2d at 972, and *United States v. Ammar*, 714 F.2d 238, 251 n.8 (3d Cir. 1983)) (emphasis removed).

9

However, I do not believe our precedent can be interpreted to preclude use immunity for Francis merely because his credibility would have been in issue had he testified. Such a broad prohibition of use immunity would be tantamount to eliminating that tool altogether even when a witness's testimony was required to satisfy the requirements of due process[5] because credibility is always an issue whenever any witness testifies. "Jurors are instructed . . . in almost all cases, that they are to determine the credibility of all witnesses who testify . . . even in the absence of an affirmative challenge to witness credibility." *United States v. Universal Rehab. Servs. (PA), Inc.*, 205 F.3d 657, 666 (3d Cir. 2000) (en banc). The mere fact that Francis' credibility would have been aggressively attacked by the prosecutor should not be sufficient to undermine the due process interests of ensuring that a defendant is able to present a defense to a criminal charge. Here, the district court's ruling deprived Mike of the only witness who could testify about Mike's knowledge of the contents of the package he received.

The fact that such testimony would have made conviction more difficult if accepted by the jury is not a reason to deny a defendant access to favorable witnesses. Each of the protections of the accused that were so carefully engrafted onto the Bill of Rights makes conviction of the guilty more difficult. That surely cannot be a reason to so narrow the doctrine of use immunity that defendants are denied access to fact witnesses. The jury system rests upon the assumption that a properly instructed jury will be able to sort through the evidence and the arguments of counsel and determine if the government has proven its case beyond a reasonable doubt.

---

[5] *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process."). *See also* Maj. Op. at 5-6 (discussing *Chambers*, 410 U.S. 284).

Judicial use immunity exists to ensure due process. Although a jury will always be free to disregard the testimony of a defense witness, courts should not usurp the jury's function by deciding the credibility of a witness.

### III. Affirmative Defense Under 23 V.I.C. § 470

Finally, before concluding, I think it helpful to state a concern and observation about the affirmative defense created by 14 V.I.C. § 470. As the majority notes, in *United States v. McKie*, 112 F.3d 626, 631 (3d Cir. 1997), we held that there is an affirmative defense to possessing a firearm under Virgin Islands law because a person had 24 hours to register the weapon before it becomes illegal to possess it. No doubt because of problems of proof, the Virgin Islands legislature amended § 470 to require "immediate" registration upon entering the Virgin Islands. However, as this case illustrates, that amendment creates more problems than it solves. It will often be impossible to rebut a claim of an intent to immediately register a firearm unless a defendant is given a sufficient opportunity to register it and fails to take any steps to do so upon entering the Virgin Islands.

In theory, the only way to disprove such a defense in the ordinary case would be for the government to establish a registration desk adjacent to the exit of the airport lobby with signs instructing all who arrived that they had to go directly to the registration desk and register any firearms. Experience with this statute has shown that police have a tendency to arrest a person with firearms as soon as he/she leaves the airport or takes possession of them rather than wait until circumstances are sufficient to refute any argument that the recipient intended to register the firearm.

Although that is perhaps understandable, the amended law creates real problems when an arrest occurs as soon as the recipient takes delivery of a weapon or leaves the airport building because there is no opportunity to immediately register the firearm. I agree that this complication does not assist Mike because all of the circumstances here supports the conclusion that he never intended to register the gun he

11

received in the first place. Moreover, Mike's attempt to seek shelter under § 470 is undermined by his attempt to also argue that he did not know what was in the package he received. I therefore join my colleagues in rejecting Mike's defense here. However, the Virgin Islands legislature may wish to consider the problems the amendment to this statute could create in future cases so that police will not have to wait a sufficient time to rebut any suggestion of an intent to immediately register a weapon before making an arrest for a violation of § 2253(a).[6]

## Conclusion

In conclusion, I concur that sufficient evidence proves that Mike violated 14 V.I.C. § 2253(a). However, I believe that the court should have granted use immunity to Francis and thereby allowed Mike to present that defense testimony.

---

[6] Judge Smith joins in these concerns and observations concerning the amendment to Section 470.