PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1652
_____

UNITED STATES OF AMERICA

v.

JUAN JARMON a/k/a J, a/k/a YIZZO,

                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-17-cr-00072-001)
District Judge: Honorable Paul S. Diamond
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
August 27, 2021
_____

No. 20-1315
_____

UNITED STATES OF AMERICA

v.

EDWARD STINSON, a/k/a E-Black,
                                         Appellant

                     _____

On Appeal from the United States District Court
     for the Eastern District of Pennsylvania
          (D.C. No. 2-17-cr-00071-001)
     District Judge: Honorable Paul S. Diamond

                     _____

    Submitted Under Third Circuit L.A.R. 34.1(a)
                 August 27, 2021

Before: HARDIMAN, ROTH, *Circuit Judges*, and
        PRATTER, *District Judge*.[*]


            (Filed: September 15, 2021)

Maureen C. Coggins
509 Swede Street
Norristown, PA 19401
*Attorney for Appellant Juan Jarmon*

Paul J. Hetznecker
Suite 911
1420 Walnut Street
Philadelphia, PA 19102
*Attorney for Appellant Edward Stinson*

_____

[*] The Honorable Gene E.K. Pratter, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Jennifer Arbittier Williams, Acting United States Attorney
Robert A. Zauzmer
Jerome M. Maiatico
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
*Attorneys for Appellee the United States of America
in Appeal No. 19-1652*

William M. McSwain, United States Attorney
Robert A. Zauzmer
Emily McKillip
Josh A. Davison
Joseph T. Labrum, III
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
*Attorneys for Appellee the United States of America
in Appeal No. 20-1315*

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

Edward Stinson and Juan Jarmon were tried, convicted, and sentenced to 30 years' imprisonment for selling large amounts of crack cocaine in a public housing complex. In this appeal, they challenge evidentiary decisions, the jury verdicts, and their sentences. We will affirm.

3

I

Stinson and Jarmon each ran drug trafficking conspiracies out of the Norman Blumberg Public Housing Complex in North Philadelphia at various times between 2010 and 2015. The Blumberg Complex included some 500 apartment units in what was intended to be a family-friendly environment that included two playgrounds. Unfortunately, that aspiration was not realized as the large quantity of drugs sold in the Blumberg Complex spurred a joint investigation among local police, the Federal Bureau of Investigation, and the United States Drug Enforcement Administration.

Government agents put up pole cameras, established wiretaps, used confidential informants to make controlled drug purchases, pulled trash, analyzed pen registers, and—after Stinson's arrest and subsequent incarceration in 2012—listened to recordings of Stinson's phone conversations while he was in prison. After authorities completed their investigation in February 2017, the grand jury returned two indictments. The first charged Stinson and twelve others with conspiracy to distribute 280 grams or more of crack cocaine and related crimes. The second charged Jarmon and twelve others with similar crimes.[1] Most of their co-defendants pleaded guilty, but Stinson and Jarmon proceeded to separate trials.

The trials shared a similar structure. In each, the Government called some law enforcement officers to testify

---

[1] Stinson was charged in both indictments, but the Government moved to dismiss all charges against him under the second indictment after his conviction under the first.

4

about the investigation. These officers gave general overview testimony, explained coded language and investigative techniques, and discussed recorded phone calls they reviewed as part of the investigation. In one recorded call—made by Stinson while in prison—Stinson ceded some of his drug territory to Jarmon.

The Government also called cooperating co-defendants who testified against Stinson and Jarmon. These witnesses explained the ins and outs of drug dealing at Blumberg. Stinson and Jarmon led their conspiracies. Each had his own group of sellers and lookouts with set wages and schedules. They used the Blumberg Complex apartments as stash houses and from there sold crack at all hours of the day.

Juries convicted Stinson and Jarmon of the conspiracy charges and most of the related charges. The District Court sentenced each to 360 months' imprisonment.

II

The District Court had jurisdiction under 18 U.S.C. § 3231, and we exercise appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. Stinson and Jarmon prematurely filed notices of appeal, which we deem timely under Rule 4(b)(2) of the Federal Rules of Appellate Procedure.

Although Stinson and Jarmon were charged in different indictments based on different underlying facts, their appeals were consolidated because they raise a common issue: whether recordings of phone calls Stinson made from prison were admissible at trial. We consider this issue first, and then turn to their separate arguments.

III

Before trial, Stinson moved to suppress recordings of phone calls he made while incarcerated. Because one of these calls was with Jarmon, Jarmon joined the motion. The District Court denied the motion, relying on our opinion in *United States v. Shavers*, where we held inmates and their interlocutors have no reasonable expectation of privacy in phone conversations if they have reason to know the calls are monitored. 693 F.3d 363, 390 & n.7 (3d Cir. 2012), *vacated on other grounds*, *Shavers v. United States*, 570 U.S. 913 (2013). We review the denial of a motion to suppress under a mixed standard: clear error for factual findings and de novo for issues of law. *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

Under *Shavers*, the motion to suppress had to be denied. Upon entering the prison, Stinson received a prisoner handbook which explained the facility's policies, including that calls are monitored and recorded. This warning is repeated on signs near the facility's telephones and in a recorded message played to both parties before every call. Neither Stinson nor Jarmon claim ignorance; they knew the calls were monitored and recorded. But they argue *Shavers* is no longer good law and that their calls were protected by the Fourth Amendment despite their knowledge of the recordings.

The Fourth Amendment protects information in which one has a "reasonable expectation of privacy." *Shavers*, 693 F.3d at 389 (quoting *New York v. Class*, 475 U.S. 106, 112 (1986)). This requires the defendant to subjectively believe the information is private and for that belief to be objectively reasonable. *Smith v. Maryland*, 442 U.S. 735, 740 (1979).

Until 2018, it was accepted that one could not have a reasonable expectation of privacy in information voluntarily turned over to third parties. *See id.* at 743–44. The Supreme Court altered this "third-party doctrine" in *Carpenter v. United States*, when it held a defendant's cell-site location information (CSLI)—data tracking a cell phone's physical location that is automatically sent by the phone to the cell carrier whenever the phone is used—is protected by the Fourth Amendment. 138 S. Ct. 2206, 2217 (2018).

The Court recognized CSLI is different. Unlike ordinary business records, the collection of CSLI by cell carriers is "inescapable and automatic" once one decides to carry a cell phone. *Id.* at 2223. The rare combination of automated disclosure and "deeply revealing" location information prompted the Court to conclude that cell phone users have a reasonable expectation of privacy in CSLI even when it was held by a private third party (a cell phone company). *Id.* at 2223. Stinson and Jarmon ask us to apply *Carpenter* to prison calls.

We decline Stinson and Jarmon's invitation to expand *Carpenter* for two reasons. First, *Shavers* did not rely on the third-party doctrine, so its holding is unaffected by *Carpenter*. *Shavers* held inmates have no expectation of privacy in their phone calls not because the recordings are held by a third party, but because of the nature of incarceration. 693 F.3d at 390 n.7. Prisoners know they are under constant surveillance. They have no general expectation of privacy during their incarceration, including in their own cells. *Hudson v. Palmer*, 468 U.S. 517, 525–26 (1984). And the prison's phone policies and warnings to inmates make any subjective expectation of privacy even more unreasonable. *See Shavers*, 693 F.3d at 390 n.7. That principle applies to both parties on the line. *Id.* at

7

389–90. A party at liberty (Jarmon) cannot reasonably expect his call to be private when he is told that his conversation with an inmate (Stinson) is being monitored. *Id.*

Even had *Shavers* relied on the third-party doctrine, *Carpenter* still would not compel a different result. While we need not decide how far *Carpenter* extends to other technologies, it does not apply to prison phone calls. Unlike an ordinary cell phone user who "in no meaningful sense . . . 'assume[s] the risk' of turning over a comprehensive dossier of his physical movements" when he turns on his phone, *Carpenter*, 138 S. Ct. 2220 (quoting *Smith*, 442 U.S. at 745), Stinson and Jarmon did assume the risk of surveillance here. After being told their calls were monitored, they continued to discuss drug trafficking and other criminal acts. And unlike CSLI, there is nothing "unique" or technologically advanced about prison phone calls that counsels for extending the Fourth Amendment to that milieu. *Id.*

For these reasons, we hold that Stinson and Jarmon had no reasonable expectation of privacy in their phone calls. We will therefore affirm the District Court's orders denying their motion to suppress.

IV

Having rejected Appellants' request to expand *Carpenter* to prison phone calls, we turn to Stinson's and Jarmon's particular arguments.

A

Stinson argues the District Court abused its discretion in admitting some testimony by FBI Agent Sarah Cardone, the

8

Government's overview witness. *See United States v. Pelullo*, 964 F.2d 193, 199 (3d Cir. 1992). He acknowledges overview witnesses may "tell the story of [the] investigation" including "how the investigation began, who was involved, and what techniques were used." *United States v. Lacerda*, 958 F.3d 196, 208 (3d Cir. 2020). But Stinson claims Agent Cardone went too far when she referred to the "Stinson drug trafficking group," Stinson App. 475, told jurors she "learned about the trafficking of crack cocaine by Edward Stinson and . . . other members of this organization," Stinson App. 472, and described a chart prepared by the prosecution showing the Government's theory of how Stinson's group was organized.

We perceive no problem with Agent Cardone's testimony. It "was limited to an account of her investigation, her personal observations, and her beliefs of what the evidence showed based on what she saw and heard and did." *Larcerda*, 958 F.3d at 210 (cleaned up). Besides, the District Court's limiting instructions throughout Agent Cardone's testimony would have cured any error. As for the chart, such exhibits are allowed when the jury is properly instructed and the chart is supported by actual evidence, as was the case here. *See United States v. Velasquez*, 304 F.3d 237, 240 (3d Cir. 2002).

B

Stinson and Jarmon separately argue the evidence at their trials was insufficient to convict them of conspiracy. Although they cite different evidence, the crux of their arguments is the same: the Government proved only the existence of mini-conspiracies to sell small quantities of crack, not overarching conspiracies to sell 280 grams or more. These arguments fail because they do not accept the evidence in the light most favorable to the jury verdict. *See United States v.*

9

*Mike*, 655 F.3d 167, 174 (3d Cir. 2011). Under that standard, there was plenty of evidence for a rational trier of fact to find proof beyond a reasonable doubt that Stinson and Jarmon orchestrated multi-year conspiracies that trafficked more than 280 grams of crack. *See id.*

For starters, Appellants recruited people in their communities to sell as much crack as possible. These were not just buyer-seller relationships. Stinson and Jarmon bought crack in bulk to distribute to their sellers who acted as employees, not customers. They set schedules and shifts and paid regular wages to their subordinates. And co-conspirators warned each other about police activity in the Blumberg Complex. *See United States v. Perez*, 280 F.3d 318, 345–47 (3d Cir. 2002) (finding "interdependency" between co-conspirators defeated the claim of multiple conspiracies). The record shows that Stinson and Jarmon were not merely part of large, ongoing criminal enterprises, but that they organized them. *See id.* at 347.

Stinson focuses heavily on the fact that some members of his conspiracy joined at different times while others left and returned later. Such behavior is common, which is why this Court held long ago that the government "may establish the existence of a continuing core conspiracy which attracts different members at different times and which involves different sub-groups committing acts in furtherance of the overall plan." *United States v. Boyd*, 595 F.2d 120, 123 (3d Cir. 1978). That one of Stinson's co-conspirators went to South Carolina for six months, or that Stinson and another co-conspirator feuded for short periods of time, did not preclude the Government from showing Stinson's participation in a single, overarching conspiracy.

10

The evidence also showed that Stinson's conspiracy and Jarmon's conspiracy each distributed 280 grams or more of crack. Besides the argument we just rejected, Stinson and Jarmon challenge the total amount of crack sold. The District Court addressed these arguments in its order denying Appellants' motions for judgments of acquittal and provided an estimate of crack quantities proven by the Government. And the trial judge's conservative calculations still exceeded 280 grams.

Stinson claims the District Court erroneously counted the same 21 grams of crack three times. We find no record support for this claim, but even if we did, the extra 42 grams would be unavailing for Stinson because the evidence at trial proved his conspiracy sold far more crack than the District Court gave it credit for. One of Stinson's co-conspirators mentioned five rocks of crack cocaine the District Court did not include in its calculations. Another said he sold crack for Stinson over 20 times, but the District Court considered only sales from his four highest grossing days. These uncounted quantities exceed the challenged 42 grams.

Jarmon's arguments on this score are even less convincing. One of Jarmon's sellers said he alone sold more than 280 grams of crack while working for Jarmon. This testimony sufficed to establish the requisite drug quantities. Jarmon also attacks the credibility of Government witnesses and questions the chain of custody for the seized drugs. But these arguments too are unpersuasive. It was the jury's prerogative to assess the credibility of the Government's witnesses. And the testimony by the DEA agents and chemists handling the drugs adequately authenticated the physical evidence. *See United States v. Rawlins*, 606 F.3d 73, 82 (3d Cir. 2010).

For these reasons, we hold the District Court did not clearly err in attributing more than 280 grams of crack to Stinson and Jarmon at sentencing. *See United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (en banc). Although sentences must be based on drug quantities reasonably foreseeable to each individual, USSG § 1B1.3(a)(1)(B)(iii), as ringleaders, Stinson and Jarmon are responsible for all the crack sold by their subordinates to further the conspiracies, *see United States v. Gibbs*, 190 F.3d 188, 219 (3d Cir. 1999). And that amount exceeds 280 grams for both Stinson and Jarmon.

C

Jarmon claims the evidence was insufficient to convict him of several substantive drug offenses charged in counts 7–18 and 24–33. Counts 7–18 were based on controlled purchases of crack directly from Jarmon. He claims the evidence was insufficient because the Government cooperators who made the purchases were unreliable, the Government lost some of the seized drugs, and the chain of custody was spotty at times. While these arguments reduce the probative value of the Government's evidence, the videos, photos, and audio recordings of Jarmon participating in these sales were enough for a jury to find him guilty beyond a reasonable doubt.

Counts 24–33, which deal with aiding and abetting drug sales, were based on intercepted calls in which Jarmon directed customers to his sellers to buy crack. These calls and the witness testimony explaining them were sufficient evidence for the jury to convict. And the slight discrepancy between when the calls occurred and the time charged in the indictment (less than an hour) amounts to, at most, a non-prejudicial variance. *See Real v. Shannon*, 600 F.3d 302, 308 (3d Cir. 2010) ("Where 'on or about' language is used, the government is not required

to prove the exact dates, if a date reasonably near is established." (quoting *United States v. Nersesian*, 824 F.2d 1294, 1323 (2d Cir. 1987))).

D

Finally, Stinson and Jarmon dispute some aspects of their sentences. Both challenge a leadership enhancement. Jarmon alone challenges a violence enhancement, an enhancement for possessing a dangerous weapon, and the reasonableness of his sentence for the substantive drug charges.

The District Court did not clearly err in applying any of the sentencing enhancements. *See United States v. Helbling*, 209 F.3d 226, 242–43 (3d Cir. 2000). Testimony by Stinson and Jarmon's co-conspirators identified them as "the boss" of their respective conspiracies. Stinson and Jarmon bought crack in bulk, hired and controlled their workers, and kept the lion's shares of the drug proceeds. So we agree with the District Court that Stinson and Jarmon were the leaders of their groups. *See id.* at 243 (citing USSG § 3B1.1 app. note 3 (listing factors showing leadership including degree of control, scope of illegal activity, and claiming the larger share proceeds)). And the conspiracies were "extensive" for purposes of the leadership enhancement; evidence at trial showed each conspiracy had at least five members. *See* USSG § 3B1.1(a).

As for Jarmon's violence and weapon enhancements, his own words are the strongest evidence against him. The Government introduced an intercepted call where Jarmon bragged about punching a female Blumberg resident in the face when she threatened to call the police. In another call, he admitted to having a gun, which he gave to a co-conspirator,

13

and said he had to get another one. So his argument against the violence and weapon enhancements is specious at best.

Nor do we find Jarmon's 360-month sentence unreasonable. The District Court properly grouped Jarmon's conspiracy count with his substantive drug offenses and sentenced him at the bottom of the Guidelines range. *See* USSG § 3D1.2(d). Such sentences are presumptively reasonable, *United States v. Pawlowski*, 967 F.3d 327, 331 (3d Cir. 2020), and given the scope of Jarmon's crimes and his past criminal history, that presumption is not rebutted here.

\* \* \*

Our review of the extensive District Court records in these cases leads us to conclude that the District Court committed no errors. Because the Supreme Court's decision in *Carpenter* cannot reasonably be extended to prison recordings, the District Court properly denied the motion to suppress. The Court afforded Stinson and Jarmon fair trials, the Government carried its burden of proof on the counts of conviction, and the sentences were reasonable. Accordingly, we will affirm.

14